Beck, C. J.
By an act of the Legislature entitled, “An act to regulate elections for the removal of county seats,” approved *450 February 11, 1881, it was, among other things, enacted, “ that not less than two-thirds of all the legal votes cast shall be necessary to effect the removal of the county seat of any county in this State."
The record before us presents the question whether the provision above cited is in conflict with Sec. 2 of Art. XIV of the constitution of this State, which is as follows:
Seo. 2. The General Assembly shall have no power to remove the county seat of any county, but the removal of county seats shall be provided for by general law, and no county seat shall be removed unless a majority of the qualified electors of the county; voting on the proposition at a general election, vote therefor; and no such proposition shall be submitted oftener than once in four years, and no person shall vote on such proposition who shall not have resided in the county six months and in the election precinct ninety days next preceding such election.
In their interpretation of the above section of the constitution, counsel for plaintiffs in error lay much stress upon the clause: “ The General Assembly shall have no power to remove the county seat of any county." They argue that the Legislature is thereby prohibited from making any enactment respecting the vote requisite for a removal, different from that named in said section 2, the same being unalterably fixed therein.
They say the negative form of expression employed in the clause, “no county seat shall be removed unless a majority of the qualified electors of the county voting on the proposition at a general election vote therefor," carries with it by necessary implication, the affirmative proposition, that if a majority do vote therefor the county seat shall be removed. Hence they affirm with great confidence, that a bare majority is the ultimatum of the constitution as to the vote which shall authorize a removal, and' that the Legislature has no power to say that the vote shall be either greater or less, its power being restricted to the single duty of providing the necessary machinery for the removal.
On the part of defendants in error, it is contended that the vote mentioned in section 2, was only intended as a limitation upon the power of the Legislature to authorize a removal by ⅜ smaller vote.
In support of this view counsel cite the familiar doctrine that State constitutions are not grants of power to legislative *451 assemblies, but limitations only; that plenary power in the Legislature for all purposes of civil government is the rule, and that prohibition to exercise a particular power is an exception.
They insist that the ordinary meaning of the clause in issue, is, that the General Assembly shall not enact that less than a majority vote may remove, but , may require a greater vote. Also, that there is no provision in the constitution, express or implied, which prohibits the passage of a law requiring a greater vote to authorize a removal.
The questions involved in the case have been ably and thoroughly discussed.
Counsel on both sides say they are all of easy solution, yet they manifest a confidence little short of absolute certainty, that the propositions which they announce in support of their respective theories are impregnable, and that the reasons assigned and authorities cited to sustain the same are conclusive.
Perhaps the great confidence entertained in these opposing views may be accounted for in part upon the theory suggested by Judge Cooley in his Constitutional Limitations, p. 49, that the different points of view from which different individuals regard constitutions, incline them to different views of the instruments themselves.
The whole controversy depends upon the solution of the single question, whether that portion of the law of 1881, which requires a two-thirds vote to remove a county seat, is in conflict with the constitutional provision, that no county seat shall be removed unless a majority of the electors voting on the proposition vote therefor.
The nature of the investigation,'upon which we are about to enter, renders the following citation from the pen of Chief Justice Shaw, peculiarly appropriate: “The delicacy and importance of the subject may render it not improper to repeat what has been so often suggested'by courts of justice, that when called upon to pronounce the invalidity of an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, Courts will approach the question with great caution, examine it in every possible aspect, and ponder upon it as long as deliberation and patient attention can throw any new light on the subject, and never declare a statute void unless the nullity and invalidity of the act are placed, in their *452 judgment, beyond reasonable doubt.” Wellington et al. Petitioners, etc., 16 Pick., 95.
The following is also appropriate respecting the duty of Courts in such investigations: “Being required to declare what the law is in the cases which come before them, they must enforce the constitution as the paramount law, whenever a legislative enactment comes in conflict with it.” Cooley’s Const'l Lim’s., (V Ed.) 193.
There would be greater force in the arguments employed to demonstrate the invalidity of the law of 1881, if the State constitution, like the National constitution, was a grant of enumerated powers. In such case we would look into the constitution .to see if the grant was broad enough to authorize the Legislature to declare what vote should be necessary to remove a county seat. But the Legislature being invested with complete power for all the purposes of civil government, and the State constitution being merely a limitation upon that power, we look into it not to see if the enactment in question is authorized, but only to see if it is prohibited.
Another rule is, that when the validity of an act of the Legislature is assailed for a supposed conflict with the constitution, the legal presumption is fn favor of the validity of the statute, and before the Court will be warranted in declaring it void, a clear conflict with the constitution must be shown to exist.
The removal of county seats is a subject over which the lawmaking power has plenary jurisdiction and control. In the absence of constitutional restriction, a removal could be authorized upon any vote, great or small, which that body deemed advisable, or without any vote at all.
Looking into Sec. 2, Art. XIV, of the constitution, we note four principal limitations upon the power of the Legislature over this subject:
First—The power to remove a county seat without a vote of the people is taken away.
Second—The minimum vote necessary to effect a removal is prescribed.
Third—A minimum limit is fixed as to the number of years that must elapse between successive submissions of the question.
*453 Fourth—The power of the Legislature is limited as to the qualifications of the voters.
The section requires the passage of a general law on the subject, the evident purpose of the requirement being, that such law shall provide the regulations, and prescribe the qualifications and requirements necessary and proper for the exercise of the right under consideration; and but for constitutional limitations, this law might provide for submitting the question of removal every year. It might qualify as an elector any resident of the county, without reference to the time of his residence therein or the precinct in which he resides, or it might enact that a plurality, instead of a majority vote should effect a removal. Such a law would clearly be in conflict wilb constitutional restrictions.
It would seem, on principle, however, that above and beyond, or outside, the minimum limit, the jurisdiction would be unrestrained. This being so, the Legislature would be as free to exercise its power and discretion in the unlimited jurisdiction as if no minimum limit on its powers had been imposed.
The application of this principle to the present controversy would show that the supposed conflict of the statute with the constitution does not exist, but that the Legislature, in the passage of the act of 1881, acted within the scope of its jurisdiction.
This view being opposed to the theory upon which this writ of error is prosecuted, we pause here to note objections which have been interposed to the constitutionality of the statute referred to.
Counsel for plaintiffs in error lay down the following propositions, concerning the constitutional provisions involved:
“The power of the Legislature is expressly prohibited from removing a county seat, and is expressly limited to providing the mode and manner and machinery for the removal. * * * The affirmative proposition implied in the negative expression, ‘No county seat shall be removed unless a majority of the qualified electors * * * vote therefor,’ is a constitutional right and power in the majority, and is a positive direction to that effect.”
Under these assumptions as to the force and effect of the *454 constitutional provisions, they inquire: “Will the courts entertain a construction that enables the Legislature, under a pretext of regulating a removal, to prohibit the exercise of the right thus granted to the majority of the qualified electors of the county?”
The question is easily answered. If the premises were as stated, the Courts would unhesitatingly answer, no. But we are compelled to say that the premises stated are not warranted by any language employed in the constitution. The authority cited in support of the conclusion drawn from the assumed premises is sound, but its application to the clauses of the constitution referred to is not perceived.
Tlie leading authority cited relates to the constitutional right of suffrage, and is as follows:
“ The Legislature may regulate as to places, mode and manner, and whatever else may be required to insure its full and free exercise. But this duty and right inherently imply, that such regulations are to be subordinate to the enjoyment of the right, the exercise of which is regulated. The right must not be impaired by the' regulation. It must be regulation purely, not destruction. If this were not an immutable principle, elements essential to the right itself might be invaded, firittered away, or entirely exscinded under the name or pretense of regulation, and thus would the natural order of things be subverted by making the principal subordinate to the accessory.” Page v. Allen, 58 Pa. St., 347.
These views were announced by Chief Justice Thompson, in defining the rights of electors under the constitution of Pennsylvania. The learned jurist prefaces his observations by quoting in haec verba, section 1 of article III of the constitution of that State. This section treats of the qualifications of electors. It divides them into three classes, and enumerates in detail the qualifications of each class. As to an individual of the first class possessing the specified qualifications, the section declares “he shall enjoy the rights of an elector.” A person of either of the other classes having the prescribed-qualifications, it declares, “shall be entitled to vote.”
It will be observed that nothing remained for legislative action in this case, but regulation purely. The qualifications were defined, fixed and enumerated in the constitution, and it *455 was affirmatively declared those possessing them should be entitled to vote. It was correctly said of rights thus solemnly vested, they “must not be impaired by regulation. It must be regulation purely, not destruction.”
Now, in order to make a plausible application of the authority cited to the negative phrase of our own constitution, “and no county seat shall be removed unless a majority of the qualified electors of the county * * * vote therefor,” it is assumed that this phraseology vests an absolute right of removal in the majority; that the language employed is self-executing and prohibitory, leaving nothing for legislative action, save to provide the mode and manner of carrying the right into effect.
This is assuming the very thing in dispute. If the framers of the constitution intended to vest such absolute rights, free from legislative interference, this is surely a case wherein they have not “expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, leaving as little as possible to implication,” which the authorities say they are presumed to have done. Cooley’s Const. Lim., 71.
If we were to adopt the interpretation contended for, it would be equivalent to inserting limitations in the constitution which its framers did not put there, for they are neither clearly expressed, nor do they arise, as we think, by necessary implication.
The clause, “ The General Aesembly shall have no power to remove the county seat of any county,” is referred to as strengthening the construction contended for. That clause has not the remotest relation to the question whether the Legislature may fix the vote, or whether it has been unalterably fixed in the constitution. Its effect is to prohibit the Legislature from removing a county seat without submitting the matter to a vote of the citizens interested. For the purpose cited it is consequently without significance.
The word “unless,” which appears in the clause under consideration, is supposed to have great force in conferring upon the phrase an affirmative meaning. Upon this point we are referred to the views expressed by Judge Folger in Manning, Bowman & Co. v. Keenan et al., 73 N. Y., 56:
He says: “The word unless has the force of except; its pri *456 mary meaning is ‘unloosened from,’ so what follows in the sentence after the word unless is excepted or unloosened from what went before it.” * * * “Such a form of expression in a statute sometimes amounts to an affirmative enactment, and in fact in proprio vigore, confers all that is excepted from a negative or restrictive provision.” * * * “Nor are instances lacking in enactments, where it is. manifest that by the expression of matter under the lead of the word ‘unless,’ it was meant to affirm the contrary of what was previously stated.”
Conceding the soundness of these views, we observe that they were announced in the interpretation of the phraseology of a statute, not of a constitution. The purpose and effect of the same negative sentence might be wholly different in the two instruments. For example, in the absence of constitutional provisions the Legislature would have unlimited jurisdiction of the subject of the removal of county seats. Were it to enact, in such case, that no county seat should be removed unless a majority of the qualified electors vote therefor, there would be an affirmative implication that such a vote would authorize a removal. The practical effect of this negative phraseology would be equivalent to an affirmative enactment, for the reason that it would be the latest expression of the will of a body having jurisdiction of the subject.
The same provision, however, in a constitution would be a direction to the law-making power, that it may not authorize, by law, the thing to be done upon a less vote than that of a majority. If the statute, when passed, should make no requirement at all on the subject of the vote, then, doubtless, effect could be given to the affirmative. implication in the constitutional provision, and a majority vote be held sufficient.
When the lowest limit only is fixed in the fundamental law, the Legislature may act without restraint in the ascending scale, as we have before stated, and having fixed in the statute the vote which shall be required, it becomes the paramount law, and nothing is left for implication. This is but enforcing the rule announced by Chief Justice Marshall in Gibbons v. Ogden, 9 Wheaton, *188, that the framers of the constitution and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.
*457 It is no answer to this view of the subject to say, “if the Legislature can say that a greater number than a majority shall be required to remove a county seat, they can say that every voter in the county shall vote for the removal, to effect the same, and thereby render nugatory the provision of the constitution as to a majority vote, and in effect prohibit the removal of a county seat.”
An argument in favor of such a construction of the constitution as will nullify a statute is not aided by a suggestion that unless the construction contended for be adopted by the courts, the Legislature will have the power to pass laws prejudicial to the rights of the people.
It is not a legal inference that if unrestrained the chosen representatives of the people may commit either a foolish or a corrupt act. Legal presumptions are in favor of the integrity and wisdom of legislators, as well as the validity of their enactments. Said Mr. Justice Washington, “it is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity until its violation of the constitution is proved beyond all reasonable doubt.” Ogden v. Saunders, 12 Wheaton, *270.
The remedy for bad or oppressive legislation, not obnoxious to constitutional restrictions, is said to be an appeal to the lawmaking power. If that should fail, the people, in their sovereign capacity, are supreme, and can correct the wrong. The courts can only enforce such limitations as the constitution imposes.
A certified copy of the proceedings of the constitutional convention, relating to section 2, article XIV, has been furnished us by counsel, accompanied by the proposition that “ the record shows clearly that the constitutional convention declared its purpose of leaving the removal of county seats to a vote of the majority of the qualified electors, and not to a two-thirds vote.”
In our judgment, these proceedings only show that a diversity of opinion existed in the convention as to how far the legislative power should be restricted on the subject of the vote that should remove a county seat. There is nothing in the *458 proceedings of the convention to point out the purpose of the provision made by it concerning this vote, beyond that conveyed by the meaning of the words employed therein.
Jno. R. Smith, H. Townsend, Wells, Smith & Macon and A. J. Rising, for plaintiffs in error.
Blackburn & Dale, for defendants in error.
The plain, common sense import of the language used, indicates an intention to restrict or limit the power of the Legislature in respect to the general law which it was required to pass on the subject. That a portion of the members were in favor of placing the limitation at a majority, and a portion at two-thirds, does not indicate a purpose of withdrawing the subject from legislative action and discretion, save only to the extent of the limitation imposed.
There are instances where the proceedings of the convention which framed a constitution, are said to furnish valuable aid in its interpretation. We do not regard this as one of them. The inquiry here is purely one of interpretation of language. The constitution derives its force, says Judge Cooley, from the people who ratified it, and their understanding of it must control. This is to be arrived at by construing the language used in the instrument, according to the sense most obvious to the common understanding.
We hold, as to the objections raised against the act of February 11, 1881, that the act is valid. And it appearing from the record, that two-thirds of the electors of Custer county, voting on the proposition, did not vote to remove the county seat of said county, from Rosita to Silver Cliff, the county seat was not removed.
The judgment of the District Court is affirmed.