**UNITED AIR LINES, INC., a Delaware corporation; and Air Wisconsin, Inc., a Wisconsin corporation, Plaintiffs–Appellants,**

v.

**CITY AND COUNTY OF DENVER, a home rule city and a Colorado municipal corporation, Defendant–Appellee.**

No. 97CA0151.

Colorado Court of Appeals, Div. II.

April 30, 1998.

As Modified on Denial of Rehearing June 25, 1998.

Certiorari Granted March 29, 1999.*

* SUMMARY OF ISSUE:

Whether the court of appeals erred in holding that section 53–97(11) of the Denver Revised Municipal Code allows section 53–92(c) of the Code to be applied so as not to violate the Commerce Clause of the United States Constitution. Denied as to all other issues.

Justice SCOTT does not participate.

648

Skadden, Arps, Slate, Meagher & Flom, L.L.P., Pamela F. Olson, Washington, D.C., for Plaintiffs–Appellants,

Brownstein, Hyatt, Farber & Strickland, P.C., Hubert A. Farbes, Jr., Lynne M. Hufnagel, Denver, for Plaintiffs–Appellants.

Daniel E. Muse, City Attorney, Maria Kayser, Assistant City Attorney, Office of the City Attorney, Denver, for Defendant–Appellee.

Opinion by Judge TAUBMAN.

Plaintiffs, United Air Lines, Inc., and Air Wisconsin d/b/a United Express (collectively the airlines), appeal the judgment in favor of defendant, City and County of Denver, upholding the constitutionality of the Denver use tax as applied to the airlines, and the subsequent assessment of penalties imposed pursuant to Denver Revised Municipal Code (Denver Code) § 53–114(a). We disagree with the airlines' contention that the ordinance as applied violated their rights under the Commerce Clause, but agree that the imposition of penalties must be reversed.

The parties stipulated to the following facts. Denver audited the airlines and assessed a use tax on the storage, use, distribution, and consumption in Denver of rotable aircraft parts, i.e., parts which can be used more than once after rehabilitation and repair. The audit period for United Airlines was from January 1, 1991 through June 30, 1994. Air Wisconsin's audit period was from July 1, 1991 through December 31, 1993. There is no dispute that both airlines stored, used, consumed, or distributed such parts in Denver during the periods in question.

Air Wisconsin conducted operations at Stapleton International Airport for commercial passenger flights between Denver and Aspen, Colorado. Those flights were the only flights conducted out of Denver by Air Wisconsin. During the audit period, Air Wisconsin purchased aircraft parts from suppliers outside of Denver that were either shipped to Denver or installed on aircraft outside of Denver but subsequently removed in Denver. Air Wisconsin paid Denver use tax based upon the total value of aircraft parts shipped into Denver less the value of parts transported or shipped out of Denver. Air Wisconsin received an assessment from the Denver Manager of Revenue based upon the aforementioned audit for unpaid use taxes for depreciated values of all airplane parts shipped into Denver during the audit period. No other use tax was assessed against Air Wisconsin's aircraft parts by any other state or local jurisdiction.

United Airlines also conducted its air carrier operations from Stapleton International Airport. It received an assessment from the Denver Manager of Revenue based upon a calculation of the use tax owed by United Airlines for depreciated values of all rotable aircraft parts shipped into Denver during the audit period. The calculation included a credit for sales or use taxes paid to California state and local taxing jurisdictions to the extent such taxes were paid for particular parts equal to, or less than, the amount of use tax due to Denver for the same parts.

In separate administrative hearings, the hearing officer, on behalf of the Denver Manager of Revenue, concluded that Denver's assessment of the use tax was constitutional

and upheld the imposition of penalties pursuant to Denver Code § 53–114(a). More specifically, the hearing officer concluded that Denver Revised Municipal Code § 53–92(c), which gives credit against its use tax for sales or use taxes previously paid to other municipalities, did not violate the Commerce Clause because it eliminates both the potential for, and the actuality of, greater taxation for interstate than intrastate goods.

The hearing officer determined that, because the ordinance's credit provision prevents Denver from assessing a higher tax against interstate articles when a taxpayer has paid taxes to other municipalities, Denver's use tax does not run afoul of the Commerce Clause. The hearing officer then concluded that, in the alternative, Denver Revised Municipal Code § 53–97(11) nonetheless insulates the use tax from constitutional attack because it exempts from the tax all sales which Denver is otherwise prohibited from taxing under the Constitution of the United States.

In a consolidated appeal pursuant to C.R.C.P. 106(a)(4), the trial court affirmed the decisions of the hearing officer. The trial court, construing all provisions of the use tax together, determined that Denver Code § 53–97(11) exempts from the use tax all sales *and purchases* which Denver is otherwise prohibited from taxing under the Commerce Clause. Under the trial court's construction, the goods of the airlines passing in interstate commerce would be subject to the same tax as intrastate goods. Thus, so construing the ordinance, the trial court found it constitutional.

This appeal followed.

## I. Standing and Mootness

At the outset, we address Denver's contention that because neither airline has suffered a cognizable injury, neither has standing to challenge the constitutionality of the use tax ordinance. More specifically, Denver argues that because Air Wisconsin had no potential tax liability to any other jurisdiction regard-

ing the aircraft parts in question, it suffered no legal injury and, therefore, does not have standing to challenge the ordinance. Similarly, Denver argues that because United Airlines received a credit for all other taxes paid on its parts, including taxes paid to the state of California, it likewise does not have a cognizable legal injury.

Although both Denver and the trial court have addressed standing, we presume, based upon their reliance on *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), that the challenge is also premised upon the doctrine of mootness. We disagree with both contentions.

■ Contrary to United's separate contention, an appellee may, without filing a notice of cross-appeal, raise arguments in support of a judgment which would not increase his or her rights under the judgment, whether or not the trial court has ruled on those arguments. *City of Delta v. Thompson*, 37 Colo. App. 205, 548 P.2d 1292 (1975).

■ Similarly, the failure to file a cross-appeal does not preclude review of jurisdiction by an appellate court. *Best v. La Plata Planning Commission*, 701 P.2d 91 (Colo. App.1984). The question of jurisdiction may be raised at any stage of the litigation, including for the first time on appeal. *See 5050 S. Broadway Corp. v. Arapahoe County Board of Commissioners*, 815 P.2d 966 (Colo. App.1991).

Accordingly, we address Denver's contentions concerning standing and mootness.

### A. Standing

■ Denver contends that, because Air Wisconsin has not suffered an injury in fact, review of the constitutionality of the use tax ordinance is precluded. We are not persuaded.

■ The conventional inquiry on standing is whether a plaintiff has suffered injury in fact to a legally protected interest as contemplated by statutory or constitutional provisions. *In re Application for Water Rights of Turkey Canon Ranch Limited Liability Co.*, 937 P.2d 739 (Colo.1997).

■ Therefore, if a party suffers no injury in fact, or suffers injury in fact but not from the violation of a legal right, no relief can be afforded, and the case should be dismissed for lack of standing. *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977).

■ A complaining party may satisfy the actual injury requirement by demonstrating that the challenged action has caused, or threatens to cause, economic injury. The injury must be direct and palpable. *Hughey v. Jefferson County Board of Commissioners,* 921 P.2d 76 (Colo.App.1996).

Here, it is undisputed that Air Wisconsin had not been taxed in other jurisdictions. However, even though Air Wisconsin had not been subject to multiple taxation under Denver's use tax, it nonetheless was, and continues to be, subject to the penalties and interest assessed against it pursuant to Denver Code § 53–114(a). Such injury is both direct and palpable and, therefore, satisfies the first requirement for standing. Further, because the party who bears the financial burden of a tax is the party aggrieved, the second requirement of standing is also met. *See Hughey v. Jefferson County Board of Commissioners, supra.*

### B. Mootness

■ Denver next contends that United Airlines is precluded from seeking review in this matter because Denver's voluntary decision to credit United Airlines for state and local taxes paid in California has made United Airline's challenge moot. Again, we disagree.

■ Appellate courts will not generally render opinions on the merits of an appeal when issues presented in the litigation become moot because of subsequent events. A case is moot when a judgment would have no practical effect upon an existing controversy, or would not put an end to any uncertainty. *Freedom From Religion Foundation, Inc. v. Romer,* 921 P.2d 84 (Colo.App.1996).

■ However, a defendant's voluntary cessation of a challenged practice does not deprive a court of its power to determine the legality of the practice. This is so because there is no certainty that the defendant will not resume the challenged practice once the action is dismissed, thereby effectively defeating the court's intervention in the dispute. *See City of Mesquite v. Aladdin's Castle, Inc., supra.*

Here, United Airlines was taxed by both state and local taxing jurisdictions of California. Because the plain language of Denver Code § 53–92(c) allows a credit only for sales or use taxes imposed by other municipalities, United Airlines would have been subjected to multiple taxation, absent a credit for state and county taxes. However, Denver "interpreted" its ordinance so as to provide a credit to United Airlines for the amount of taxes paid to both state and local taxing jurisdictions of California. Thus, although Denver's voluntary action effectively eliminated any economic injury from disparate taxation, such voluntary action does not moot United Airlines' challenge.

Denver cannot effectively avoid constitutional inquiry concerning the ordinance through voluntary cessation of challenged conduct. *See City of Mesquite v. Aladdin's Castle, Inc., supra; Byrne v. Title Board,* 907 P.2d 570 (Colo.1995) (appeal from Title Board's refusal to conduct hearing within 48–hour period not rendered moot, even after elector received hearing, because there was no reason to believe that, in the future, under similar circumstances, elector would be able to obtain review before board within 48 hours).

Further, we note that United Airlines, like Air Wisconsin, suffered economic injury because it was, and continues to be, subject to the penalties and interest assessed against it. Thus, neither lack of standing nor mootness precludes our review.

### II. Commerce Clause Challenge to Use Tax

■ The airlines challenge the trial court's ruling upholding the constitutionality of the use tax. Specifically, they contend that Denver's use tax violates the Commerce Clause because it discriminates unfairly against its rotable aircraft parts which pass in interstate commerce. We do not agree.

■ At the outset, we note that, in their appellate brief, the airlines maintain that because Denver "has not cross-appealed the District Court's decision that the Denver Use Tax is unconstitutional on its face, . . . this issue is not properly before the Court. . . ." Contrary to the airlines' contention, the trial court did not rule the use tax ordinance unconstitutional on its face. Thus, we address only the constitutionality of the ordinance as applied.

■ The Commerce Clause, although phrased merely as a grant of authority to Congress to regulate commerce among the several states, contains a negative command forbidding the individual states from discriminating against interstate trade. More specifically, the clause prohibits economic protectionism, i.e., regulatory measures designed to benefit in-state economic interests by burdening out-of-state competition. *New Energy Co. v. Limbach*, 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988).

■ However, a use tax is valid if it is a compensatory tax designed to compensate a state or municipality for revenue lost when residents purchase out-of-state goods for use within the state. *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988). Thus, a valid compensatory tax may not impose greater tax liability on interstate articles than on intrastate articles. *Associated Industries v. Lohman*, 511 U.S. 641, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994).

■ A use tax which does not allow a credit for taxes paid to other taxing jurisdictions violates the Commerce Clause because it imposes only a single tax on intrastate purchases, but results in payment of multiple taxes on interstate purchases. *Associated Industries v. Lohman, supra.*

■ A state tax on interstate commerce, such as Denver's use tax, does not violate the Commerce Clause if the tax: (1) is applied to an activity with a substantial nexus with the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the taxing state. *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977); *Riverton Produce Co. v. State*, 871 P.2d 1213 (Colo. 1994). The airlines' challenge here concerns only steps two and three of this test.

■ A facially neutral statute may violate the Commerce Clause if the state enforces it in a manner that favors intrastate carriers over interstate carriers. *Amerada Hess Corp. v. Director, Division of Taxation*, 490 U.S. 66, 109 S.Ct. 1617, 104 L.Ed.2d 58 (1989); *Riverton Produce Co. v. State, supra.*

■ When determining the constitutionality of an ordinance, a court is guided by basic rules of statutory construction. First, an ordinance is typically presumed to be constitutional, and the party attacking the ordinance has the burden to establish that the ordinance is unconstitutional beyond a reasonable doubt. *See Denver Publishing Co. v. City of Aurora*, 896 P.2d 306 (Colo. 1995). *See also* Gibson, *Beyond a Reasonable Doubt: Colorado's Standard for Reviewing a Statute's Constitutionality*, 23 Colo. Law. 835 (April 1994) (discussing origin of beyond a reasonable doubt standard).

■ Second, if a challenged ordinance lends itself to alternate constructions, one of which is constitutional, the constitutional interpretation must be adopted. *See People ex rel. City of Arvada v. Nissen*, 650 P.2d 547 (Colo.1982). It is the duty of a court to construe an ordinance so as not to invalidate it. *Hiatt v. Manitou Springs*, 154 Colo. 525, 392 P.2d 282 (1984).

■ Additionally, a tax ordinance, just like a statute, should be construed to give consistent, harmonious, and sensible effect to all its parts. *See Walgreen Co. v. Charnes*, 819 P.2d 1039 (Colo.1991).

Denver Code § 53–92(c) provides:

It is hereby declared to be the legislative intent of the city, acting through its duly elected representatives, that the provision of this article shall apply to any person who has already paid a retail sales tax or a use tax in respect to the sale of a service or tangible personal property taxable hereunder, to a municipal corporation organized and existing

under the authority of the laws or the Constitution of any state in an amount less than the tax imposed by this article, and who thereafter causes a service or tangible personal property, taxable hereunder, to be used, stored, distributed or consumed in the city, but the tax imposed by this article shall, in such event, be measured by the difference between the amount imposed by this article and the amount previously imposed by the other municipality on said sale. If the retail sales tax imposed and paid to such municipal corporation aforesaid is equal to or more than the tax imposed by this article, no tax shall be due hereunder for the exercise of the privilege or using, storing, distributing or consuming such service of personal property in the city.

Denver Revised Municipal Code § 53–96(1) provides that Denver's use tax is levied on the "purchase price paid or charged upon all sales and purchases" of tangible personal property. However, Denver exempts from the use tax, "[a]ll sales which the city is prohibited from taxing under the Constitution or laws of the United States or the Constitution of the state." Denver Revised Municipal Code § 53–97(11). Thus, on its face, the exemption to the use tax applies only to sales while the tax itself applies to both sales and purchases.

However, the ordinance is subject to two conflicting interpretations. The airlines, based upon the plain language of the ordinance, interpret the use tax to allow a credit only for taxes paid to other municipal corporations and not for taxes paid to other states and non-municipal local governments. The other construction, adopted by the trial court, interprets the use tax provision as a whole to comport with the Commerce Clause. Specifically, the trial court construed the use tax as exempting from the tax all sales and purchases which are otherwise prohibited from being taxed under the constitution or laws of the United States. In our view, the trial court's interpretation is correct. Such a construction is consistent with the supreme court's mandate in both *Hiatt v. Manitou Springs, supra,* and *People ex rel. City of Arvada v. Nissen, supra.*

Significantly, the ordinance defines the terms, "sale," "purchase," and "sale and purchase" identically. Denver Revised Municipal Code § 53–95(21) provides:

> The term 'sale,' 'purchase,' or 'sale and purchase' includes transactions whereby the acquisition of tangible personal property was effected by (a) the transfer, conditionally or absolutely, of title or possession or both of the tangible personal property; or (b) a lease, hire or rental of, or a grant of a license to use (including royalty agreements) tangible personal property....

Thus, construing these provisions of the ordinance together, Denver Code § 53–91(11) exempts from taxation all sales and purchases which Denver is otherwise constitutionally prohibited from taxing.

Accordingly, a taxpayer may seek an exemption from the use tax if Denver fails to give full credit for taxes paid in other taxing jurisdictions, including states, counties, and municipalities. Under this construction, the tax liability would be the same on the airlines' rotable aircraft parts as on intrastate purchases. Additionally, since the ordinance provides a credit against the use tax for taxes paid in other states, the use tax is fairly apportioned. *See D.H. Holmes Co. v. McNamara, supra.*

Thus, as applied, the Denver ordinance use tax was fairly apportioned and does not discriminate against interstate commerce. Therefore, the ordinance does not violate the Commerce Clause.

*Associated Industries v. Director of Revenue,* 918 S.W.2d 780 (Mo.1996), decided on remand from *Associated Industries v. Lohman, supra,* does not persuade us to the contrary. There, Missouri's supreme court struck down an entire use tax ordinance as violative of the Commerce Clause because it imposed an additional 1 1/2% use tax on all transactions subject to it, thereby impermissibly discriminating against interstate commerce. The court rejected the argument that an exemption in the ordinance for, "property, the storage, use, or consumption of which this state is prohibited from taxing under the Constitution.. of the United

States," saved the ordinance from otherwise violating the constitution. The court concluded:

> The exemption ... is defined by 'property,' presumably a certain discernible type of property ... the Supreme Court's exception to the use tax [in *Associated Industries of Missouri v. Lohman* ] is based not on the inherent nature of the property in question, but rather on local sales tax rates.

Unlike in *Associated Industries,* here the exemption is not based upon the inherent nature of the property, but rather on how the use tax in general applies to sales, or more specifically, sales and purchases. Thus, in our view, the exemption allows the ordinance to be applied within constitutional bounds unlike the nature of the exemption in *Associated Industries, supra.*

Because this construction permits credit for taxes paid to other taxing jurisdictions apart from municipalities, we need not determine whether Denver's lateral tax credit structure violates the Commerce Clause.

### III. Penalties

 The airlines also contend that the trial court erred in upholding the penalties assessed pursuant to Denver Revised Municipal Code § 53–114(a) because they have demonstrated good cause as required by the Denver Revised Municipal Code § 53–133. However, the record is ambiguous as to whether the hearing officer concluded that the imposition of penalties was required by Denver Code § 53–114 or whether she exercised her discretion in upholding the assessment of penalties against the airlines.

If the hearing officer determined that the imposition of penalties was mandatory, she erred in not considering whether the airlines have shown good cause to warrant waiver of such penalties. In the alternative, even if we assume *arguendo,* that the hearing officer did in fact exercise her discretion in upholding the penalties, there are no findings in regard to waiver for good cause, and thus, we must remand the matter for the entry of findings on that issue.

Here, the hearing officer found that, under Denver Code § 53–114(a), the imposition of penalties against the airlines is automatic, the penalties resulted from an audit that revealed taxes were due which were not paid, and Denver Code § 53–133 did not mandate the waiver of penalties.

Under these circumstances, we conclude that the matter must be remanded for factual findings regarding whether good cause existed to waive the 10% penalty against the airlines. *See Boice v. Industrial Claim Appeals Office,* 800 P.2d 1339 (Colo.App.1990) (where findings of fact and conclusions of law insufficient and it is unclear whether proper legal standard applied, remand for clarification and further findings is necessary). The hearing officer may, in his or her discretion, allow the parties to submit additional evidence concerning the issue.

The judgment is affirmed in all respects except as to the portion thereof upholding the imposition of penalties. That portion of the judgment is reversed, and the cause is remanded for further remand to the hearing officer to resolve the issue concerning waiver of penalties consistent with this opinion.

Judge CASEBOLT concurs.

Judge BRIGGS specially concurs.

Judge BRIGGS specially concurring.

While I concur in the outcome, I write separately for two reasons. First, I cannot join the opinion without expressing my concerns with a familiar litany: The party challenging a legislative enactment must present proof beyond a reasonable doubt the enactment is unconstitutional. Second, my concurrence is driven, not just by what issues are raised, but also by what is not raised.

### I.

When rejecting a constitutional challenge, Colorado appellate opinions typically begin by referencing the supposed requirement of "proof beyond a reasonable doubt." However, the supreme court has never actually applied the requirement as a basis for rejecting a constitutional challenge. I do not take the reference as literally adding a step to be

applied in a proper constitutional analysis. Nor do I believe it should be added and applied, particularly in its present incantation.

When added to an opinion addressing the constitutionality of a legislative enactment, the requirement of proof beyond a reasonable doubt appears innocent enough. However, it subtly mutates the accepted beginning point for a constitutional analysis, creating an additional and final step which, even when taken properly, is treacherous. More importantly, it is a step seldom, if ever, properly taken.

### A.

The genesis of the phrase is the familiar observation that a court, when addressing the constitutionality of a legislative enactment, must accord deference to a co-equal and representative branch of government. This but recognizes that the structures of our national, state, and local governments are based on the doctrine of separation of powers. In this system, the courts must recognize the political and administrative responsibilities of the legislature and must not, even negatively, undertake to legislate. *See generally* H. Hart & A. Sacks, *The Legal Process: Basic Problems in the Making and Application of Law* (W. Eskridge & Frickey eds.1994); J. Thayer, *The Origin and Scope of The American Doctrine of Constitutional Law,* 7 Harv. L.Rev. 129 (1893).

A principle long ago derived from this deference is that a legislative enactment is presumed to be constitutional. *See Ogden v. Saunders,* 12 Wheat. 213, 25 U.S. 213, 6 L.Ed. 606 (1827); *People ex rel. Tucker v. Rucker,* 5 Colo. 455 (1880). This rephrasing of general deference as a derivative presumption merely creates an obvious beginning point for a constitutional analysis: Unless persuaded otherwise, a court will not strike down a legislative enactment as unconstitutional.

The presumption retains the necessary sensitivity to the court's task. *See Blodgett v. Holden,* 275 U.S. 142, 48 S.Ct. 105, 72 L.Ed. 206 (1927)(resolving a constitutional challenge to a legislative enactment is the gravest and most delicate duty that a court is called on to perform.). At the same time, courts also retain the inherent authority, and duty, to determine independently whether a legislative enactment violates a constitutional right or prohibition. *See Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *Pena v. District Court,* 681 P.2d 953 (Colo. 1984). Hence, in converting deference into a presumption, nothing untoward has occurred.

### B.

The next derivative step, also taken long ago, was to espouse that a legislative enactment must be "proved unconstitutional beyond a reasonable doubt." *See Alexander v. People,* 7 Colo. 155, 2 P. 894, 896 (1884); *see also Ogden v. Saunders, supra.* Despite its benign appearance, the result is to extend necessary deference to an extreme degree, while at the same time creating analytical difficulties.

Typically, with a presumption of constitutionality as a starting point, a court proceeds with its analysis by articulating and applying an appropriate standard of review. For example, in addressing a substantive due process or equal protection challenge, a court must first determine whether the challenged legislative enactment creates a suspect class or affects a fundamental constitutional right. *Lorenz v. State,* 928 P.2d 1274 (Colo.1996). If so, then the court must "strictly scrutinize" the challenged provision to determine whether it is narrowly tailored to achieve a compelling governmental interest. If not, then the court need only determine whether the enactment bears a "rational relationship" to a legitimate governmental purpose. *People v. Young,* 859 P.2d 814 (Colo.1993).

The court next applies the appropriate standard of review, such as by striking a proper balance between competing interests. *See Cole v. State,* 673 P.2d 345 (Colo.1983). Finally, having applied the standard of review, the court comes to its conclusion. If it is persuaded the enactment is unconstitutional, the presumption of constitutionality has been overcome.

This would seem to be the end of the analysis. However, by requiring that the

court's conclusion be based on "proof beyond a reasonable doubt," a court creates "something more than a mere form of language." *See* J. Thayer, *supra,* 7 Harv. L.Rev. at 143. No longer is it sufficient that the court is persuaded a legislative enactment is unconstitutional. Having otherwise completed its analysis and reached that conclusion, the court must now additionally determine whether it is convinced of its decision by a degree of certainty, or firmness of conviction, that is "beyond a reasonable doubt." It is this additional step that raises several concerns.

### C.

Requiring a court to be persuaded that a legislative enactment is unconstitutional "beyond a reasonable doubt" is an extreme degree of deference, one that itself is not, and has never been, free of doubt. Among the concerns raised by such a degree of deference is its failure to recognize that members of a legislative branch may vote for a law because it is politically expedient to do so, even though they doubt or at least question the enactment's constitutionality. Further, requiring such an extreme degree of certainty is not without impact on the constitutional rights of citizens. *See generally* G. Lawson & C. Moore, *The Executive Power of Constitutional Interpretation,* 81 Iowa L.Rev. 1267 (1995–96); J. Thayer, *supra.*

In addition, the requirement places a heavier burden of persuasion on citizens in our state courts than on those in our federal courts. When the identical challenge is raised under our federal constitution in state and federal courts, it is not clear why the burden of persuasion should vary.

The requirement of proof beyond a reasonable doubt has never provided the expressed basis for striking down a legislative enactment in any of our state's appellate opinions. The very fact that many decisions upholding legislative enactments have been far from unanimous arguably indicates that our courts often have *not* actually deferred to such an extreme degree. Indeed, it would be surprising to see any appellate court that was firmly convinced a legislative enactment was unconstitutional nevertheless conclude the statute must be upheld because the majority was not convinced "beyond a reasonable doubt."

### D.

Apart from the questionable wisdom in theory of adding "proof beyond a reasonable doubt" as an additional and final step in a constitutional analysis, the more serious concern comes in practice. The requirement has simply not been properly applied. The three most common misapplications are: 1) misstating what should be, at best, a heightened burden of persuasion as an evidentiary burden of proof; 2) merging what should be, at best, the last step in a constitutional analysis into an earlier step; or 3) espousing the litany, but then never applying it.

### 1.

It is typical to state both that a legislative enactment is presumed to be constitutional and that the burden of "proof" is "beyond a reasonable doubt." This resembles nothing so much as the presumption of innocence and burden of proof involved in a criminal case— an evidentiary burden of proof.

The purpose of a constitutional analysis is of course not to make factual findings. Some underlying factual disputes may have to be resolved. However, no heightened standard of proof applies, and the ultimate purpose is still the resolution of a constitutional challenge through legal analysis.

Even when the challenge is to the constitutionality of a legislative enactment as applied, the "evidence" required for the legal analysis is often undisputed, consisting of no more than the legislative enactment, a factual context, and perhaps some uncontested legislative history. The "evidence" may even take the form of mere rational speculation. *See F.C.C. v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211, 222 (1993)("[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."). When the challenge is that a legislative enactment is facially overbroad, the underlying facts may become even less important. *See*

*People ex rel. Tooley v. Seven Thirty–Five East Colfax, Inc.,* 697 P.2d 348 (Colo.1985).

Nevertheless, because of the striking similarities, the two unrelated analyses, one legal and one factual, are easily confused. The unfortunate result can be a misdirected focus in a constitutional analysis on the "evidence" presented, thus improperly implying that a question of fact controls and must be resolved. *See generally* L. Gibson, *Beyond A Reasonable Doubt: Colorado's Standard For Reviewing A Statute's Constitutionality,* 23 Colo. Law. 835 (April 1994)("Colorado courts do not find statutes unconstitutional absent *evidence* beyond a reasonable doubt." (emphasis added)).

To the contrary, the court's ultimate degree of certainty, or firmness of conviction, in a conclusion resolving a constitutional challenge does not result from the evidence, or "proof," presented. It results from the force, or persuasiveness, of legal argument.

### 2.

The confusion does not end there. It is not unusual to see this supposedly final analytical step in a constitutional analysis instead merged into the earlier steps of selecting and applying an appropriate standard of review, such as "rational relationship" or "strict scrutiny."

When this happens, no longer does the lesser standard of "rational relationship" merely require that a legislative enactment be upheld so long as the governmental classification is based on differences that are real and not illusory and is rationally related to a legitimate governmental interest. Under the merged "rational relationship" test, the challenging party must also "prove" the enactment unconstitutional "beyond a reasonable doubt." *Colorado Auto Auction Services Corp. v. City of Commerce City,* 800 P.2d 998, 1004 (Colo.1990).

Conversely, if the classification affects a fundamental right or suspect class, under the merged test the consequence is not just to subject the enactment to "strict scrutiny" in order to determine if it is narrowly tailored to achieve a compelling governmental interest. In addition, the "burden of proof" shifts

to the government, not just to come forward with justification for the enactment, but also to prove the constitutionality of the enactment—albeit by some unarticulated degree of certainty apparently less than "beyond a reasonable doubt." *See Rickstrew v. People,* 822 P.2d 505 (Colo.1991); *see also Denver Publishing Co. v. City of Aurora,* 896 P.2d 306 (Colo.1995).

What is of interest in this merging of separate analytical steps is that the deference to which a co-equal branch of government is entitled appears and disappears, case by case, depending on the nature of the constitutional right or classification asserted. While it may be appropriate to vary the standard of review in a constitutional analysis on such bases, it is unclear why the respect and sensitivity to which each branch of government is entitled should be anything less than invariable.

### 3.

The final, and most common, use of the litany is simply to state at the outset of the legal analysis that a challenge to the constitutionality of a legislative enactment requires proof beyond a reasonable doubt. The supposed requirement is then never mentioned again.

Its purpose is never explained. Because the supposed constitutional principle is typically recited and ignored in opinions in which the challenged legislative enactment is upheld, it appears as no more than a thinly-veiled rationalization. Whatever the purpose, its use in this manner neither adds to nor clarifies a constitutional analysis.

### E.

I recognize the United States Supreme Court first formulated the incantation. Context, however, is critical. It was not until *Marbury v. Madison, supra,* that the Court had even addressed the issue of judicial authority to review the constitutionality of legislative declarations. The decision in *Marbury* hardly quieted the debate. *See generally* J. Thayer, *supra.*

It is thus not surprising that an extremely sensitive and cautious Supreme Court, in *Ogden v. Saunders, supra,* 25 U.S. at 270, found it politically astute to add an additional observation: "It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond a reasonable doubt."

However, it is likewise not surprising that the United States Supreme Court has not uttered the phrase as part of a constitutional analysis in more than half a century. *See Adkins v. Children's Hospital,* 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923). In its place, the Supreme Court has returned to a simple expression of deference. *See Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985).

### F.

The parties have raised no issue concerning the framework for analyzing the constitutional issue before us. Repeating the litany of "proof beyond a reasonable doubt" has not impacted the result we reach in this case. As already noted, it has not impacted the result in any published case—thus far.

I nevertheless write separately because it is, after all, a constitutional principle we are supposedly espousing. It has impact on the perception of our state's appellate courts:

> [Appellate opinions] serve to uphold the moral power of the courts, without which the judiciary would be ineffectual.... [T]he prestige of the judiciary ... is related to the quality of the opinions of the courts as statements of reasoning. When the reasoning of an opinion fails adequately to support the decision in a case, it is the entire judicial process that suffers.

> . . . .

> One of the most intense ... controversies in recent American jurisprudence has centered precisely on the point of adequate judicial reasoning in reaching decisions.... The reasons of

decision become constitutional principles, and as principles they acquire a force of their own.... [T]hey stand around 'like a loaded weapon' waiting to be fired when the constitutional occasion arises.

C. Miller, *The Supreme Court and the Uses of History,* pp. 11–14 (1969); *see also* R. Aldisert, *The Judicial Process* Ch. 3, § 4 (1976)(discussing the role of judicial rules and principles).

What is important in the final analysis, constitutional or otherwise, is that appellate courts articulate principles and standards that are needed and useful. It is debatable whether requiring any heightened degree of deference is either. *Cf. Walters v. National Ass'n of Radiation Survivors, supra.* Even if both, requiring that a constitutional challenge rest on "proof beyond a reasonable doubt" is neither.

### II.

United asserts a violation only of the Commerce Clause. It does not, for example, assert that the Denver Municipal Code, so interpreted, violates due process by failing to give fair advance notice of just what activities and properties are subject to taxation. Hence, our review is limited to the single issue raised on appeal.

In construing Denver's taxing scheme not to violate the Commerce Clause, the majority relies on the exemption from sales and use taxes set forth in Denver Revised Municipal Code § 53–91(11). It exempts "[a]ll sales which the city is prohibited from taxing under the constitution or laws of the United States or the Constitution of the state." The majority construes this to exempt from taxation all sales and purchases that Denver is otherwise constitutionally prohibited from taxing.

Like the majority, I am persuaded (although perhaps not beyond a reasonable doubt) that this construction reflects Denver's intent. So construed, the exemption necessarily defeats any constitutional challenge to any tax on any sale or any purchase. If a court determines a particular application of § 53–96(1) would otherwise violate the

Commerce Clause, under § 53–97(11) it must construe § 53–96(1) to exclude that application. It thus becomes a tautology to say that the tax imposed under the Denver Municipal Code does not violate the Commerce Clause.

Therefore, in light of the limited issue before us, I concur.