**William D. BONTRAGER,
Plaintiff–Appellant,**

v.

**LA PLATA ELECTRIC ASSOCIATION
INC., Defendant–Appellee.**

No. 02CA0234.

Colorado Court of Appeals,
Div. III.

Feb. 27, 2003.

William D. Bontrager, Pro Se.

Maynes, Bradford, Shipps & Sheftel, LLP, Thomas H. Shipps, John Barlow Spear, Laranne Arbaugh, Durango, Colorado, for Defendant–Appellee.

Kent L. Singer, Denver, Colorado, for Amici Curiae Colorado Rural Electric Association and Tri–State Generation and Transmission Association, Inc.

Opinion by Judge WEBB.

This case challenges a nonprofit cooperative electric association's investment of member capital in for-profit, nonelectric subsidiaries. Plaintiff, William D. Bontrager, appeals the trial court's judgment in favor of defendant, La Plata Electric Association Inc. (LPEA). Contrary to plaintiff's contentions, we conclude that LPEA acted within its statutory authority and governing documents, and therefore we affirm.

LPEA is a nonprofit cooperative electric association that was formed under § 41–16–210, et seq., C.R.S.1935, and is now subject to

§ 7–55–101, et seq., C.R.S.2002 (article 55). LPEA was a public utility subject to the jurisdiction of the Public Utilities Commission (PUC). Section 40–1–103(2)(a), C.R.S. 2002. In 1993, LPEA obtained an exemption from PUC regulation under the Cooperative Electric Associations Act, § 40–9.5–101, et seq., C.R.S.2002 (CEA Act).

In 1995, LPEA's members voted to amend the purpose section of its articles of incorporation to allow LPEA "to form one or more subsidiary business organizations to provide such other services as may be permitted by law for the benefit of the cooperative, its members or non-members." Thereafter, LPEA formed and invested member capital in two for-profit, nonelectric subsidiaries, one of which took bankruptcy.

Plaintiff, an LPEA member, commenced this action for injunctive and declaratory relief challenging LPEA's formation of and investment in the subsidiaries on multiple grounds. As relevant here, plaintiff moved for partial summary judgment on his argument that LPEA exceeded its statutory authority, articles of incorporation, and bylaws. LPEA filed a cross-motion for partial summary judgment. The parties agreed the trial court should first resolve these issues.

The trial court denied plaintiff's summary judgment motion and granted partial summary judgment for LPEA. The court entered a judgment declaring that LPEA's formation of and investment in the subsidiaries was not prohibited by the governing statutes, its articles of incorporation, or its bylaws. The parties then dismissed the remainder of the case, and plaintiff now appeals.

■ When, as here, the parties do not raise factual disputes, issues of statutory interpretation are particularly appropriate for resolution on summary judgment. *See Oklahoma ex rel. Dep't of Human Servs. v. Weinberger*, 741 F.2d 290 (10th Cir.1983).

## I.

Raising questions of first impression in Colorado, plaintiff argues the governing statutes restrict LPEA to providing electric and related services and prohibit it from owning and investing in for-profit, nonelectric subsidiaries. We disagree.

Statutory interpretation is a question of law that we review de novo. *Colo. State Bd. of Accountancy v. Paroske*, 39 P.3d 1283 (Colo.App.2001).

When interpreting a statute, our primary responsibility is to determine the intent of the General Assembly. *People v. Cooper*, 27 P.3d 348 (Colo.2001). We begin with the statute's language, which we afford its ordinary and common meaning. We construe statutes as a whole, give effect to every word, and resist forced or strained constructions. *Bd. of County Comm'rs v. Vail Assocs., Inc.*, 19 P.3d 1263 (Colo.2001).

We presume the General Assembly intended the entire statute to have effect and also intended a just and reasonable result. Section 2–4–201(1)(b)–(c), C.R.S.2002; *People v. Luther*, 58 P.3d 1013 (Colo.2002); *Climax Molybdenum Co. v. Walter*, 812 P.2d 1168 (Colo.1991).

■ If separate clauses within a statute can be reconciled using one interpretation but would conflict under another, we adopt the interpretation allowing for consistency. *People v. Dist. Court*, 713 P.2d 918 (Colo. 1986). When multiple statutes or multiple statutory provisions apply to the subject matter, we examine all applicable provisions to ascertain legislative intent. *R.E.N. v. City of Colorado Springs*, 823 P.2d 1359 (Colo.1992). We favor an interpretation that gives consistent and harmonious effect to all provisions. *Charnes v. Boom*, 766 P.2d 665 (Colo.1988).

We look to legislative history and other extrinsic factors only if the statute is ambiguous or portions of the statute may conflict. *People v. Cooper, supra.*

## A.

We first reject plaintiff's contention that the CEA Act and article 55 limit LPEA to providing electric and related services.

Section 40–9.5–101 of the CEA Act allows a cooperative electric association, regulated by an elected governing body, to exempt itself from PUC regulation by an affirmative vote of its members. Under § 40–9.5–107,

an exempt cooperative electric association must continue to perform various "duties" connected with its provision of electric services. Among other duties, the statute requires the following:

(1) Cooperative electric associations shall provide reasonably continuous and adequate electric utility service to all members and consumers. . . .

(2) Cooperative electric associations shall provide and maintain reasonably adequate facilities for the provision of electric utility service within their certificated service areas.

(3) All cooperative electric associations shall cooperate with each other and with other electric utilities in avoiding unnecessary construction of facilities and cooperate in the joint use of facilities for generation, transmission, and distribution of electric energy.

(4) Cooperative electric associations shall construct and maintain their facilities in a careful and safe fashion so as to minimize hazards to either persons or property.

■ Plaintiff contends that, had LPEA remained subject to PUC regulation, it could have invested in for-profit, nonelectric subsidiaries only with PUC approval. Thus, according to plaintiff, § 40–9.5–107 prohibits these investments because the section establishes only duties relating to electric services, and no other statute grants broader powers. We are not persuaded.

■ "Powers" and "duties" have different meanings: duties are obligations that must be fulfilled; powers are rights that need not be exercised. *Black's Law Dictionary* 521, 1189 (7th ed.1999); *see* 2A Norman J. Singer, *Sutherland on Statutory Construction* § 47.27 (6th ed.2000)(use of dictionary appropriate to interpret undefined statutory terms).

■ While statutory identification of a duty may imply the power necessary to perform that duty, we cannot imply a limitation on powers extraneous to the duties listed. *Cf. Frontier Ditch Co. v. Southeastern Colo. Water Conservancy Dist.*, 761 P.2d 1117 (Colo.1988)(state's duty to protect the right of appropriators did not deprive it of the power to enter into interstate compacts and delegate this duty to a sister state).

Consideration of the entire statutory scheme also weighs against plaintiff's interpretation of § 40–9.5–107. Section 40–9.5–112 states: "Except as otherwise provided in [the CEA Act], the provisions of article 55 of title 7, C.R.S., shall apply to cooperative electric associations." The parties agree that LPEA is subject to article 55.

Section 7–55–102(1) provides, in relevant part, that a Colorado cooperative "may be associated and incorporated for the cooperative transaction of any lawful business, except banking." Section 7–55–108 states: "The powers enumerated in section 7–55–107 shall vest in every cooperative corporation in this state except those organized under or subject to article 56 of this title, although such powers may not be specified in its charter or in its articles of incorporation." Section 7–55–107 lists the "powers" of cooperative associations, including the power to "hold such real and personal property as may be necessary for the legitimate business of the corporation." Section 7–55–107(1)(d). Thus, the General Assembly recognized the difference between these terms by addressing "duties" in § 40–9.5–107 and "powers" in § 7–55–107.

Section 7–55–116 incorporates the for-profit and nonprofit sections of the Colorado Corporation Code "and all powers and rights thereunder . . . except where such provisions are in conflict with or inconsistent with the express provision of this article." Because a cooperative association "shall not be carried on for profit," § 7–55–101(1)(d), we focus on the purposes and powers of nonprofit corporations provided in § 7–123–101, et seq., C.R.S.2002.

Nonprofit corporations likewise may engage "in any lawful business." Section 7–123–101(1). They are empowered to "purchase, receive, subscribe for, and otherwise acquire shares and other interests in, and obligations of, *any other entity*." Section 7–123–102(1)(f) (emphasis supplied).

Here, the 1995 amendment to LPEA's articles of incorporation broadened its purposes to include forming entities that provide "oth-

er services." A cooperative association enjoys the power to amend its articles, § 7–55–109, as does a nonprofit corporation, § 7–130–101(1), C.R.S.2002. And forming other entities constitutes a "lawful business." Sections 7–55–102(1), 7–123–101(1).

Moreover, once LPEA's purpose was broadened by the amendment, its ownership of nonelectric subsidiaries would constitute holding personal property necessary for the association's legitimate business, § 7–55–107(1)(d), and acquisition of shares in "any other entity," § 7–123–102(1)(f).

Hence, we cannot conclude the General Assembly intended to limit cooperative electric associations to providing electric service.

Nevertheless, plaintiff argues we should construe "any lawful business" in § 7–55–102(1) narrowly for several reasons, none of which we find persuasive.

First, plaintiff asserts that public grants of power which create an advantage against the general public should be strictly construed. *See* Singer, *supra,* § 63.2.

■ Under this rule, we must assume nothing passes from the sovereign to a private grantee by implication, *see* Singer, *supra,* and we must adopt a construction that favors the sovereign rather than the grantee. *Snake River Ranch v. United States,* 542 F.2d 555 (10th Cir.1976). The strict construction rule operates to limit the advantage as against the general public, such as the scope of an exclusive franchise or a tax exemption. *See* Singer, *supra,* § 63.6 n. 4. However, we need not abandon the plain meaning of applicable statutory language. *Marek v. Chesny,* 473 U.S. 1, 105 S.Ct. 3012, 87 L.Ed.2d 1 (1985).

■ Here, § 7–55–102(1) unambiguously grants to cooperative associations the right to engage in "any lawful business, except banking." Plaintiff does not explain, and we cannot discern, how the phrase "any lawful business" could be narrowly construed. *See Obert v. Colo. Dept. of Social Services,* 766 P.2d 1186 (Colo.1988)(interpreting "any" as meaning without restriction).

LPEA does not assert an exclusive franchise to provide the services in which the subsidiaries engage, nor does LPEA contend the subsidiaries would share in its tax exempt status. Hence, the rationale of the strict construction rule would not require a narrow interpretation of "any lawful business" as applied to LPEA's ownership of the subsidiaries.

Second, plaintiff notes that § 40–9.5–112 incorporates article 55 rather than § 7–56–101, et seq., C.R.S.2002 (article 56), which grants cooperative associations subject to its provisions more extensive powers than those enjoyed by associations subject to article 55. Plaintiff argues the General Assembly thus intended to limit the power of associations subject to article 55.

■ Article 55 was enacted in 1983, when article 56 applied only to agricultural cooperatives. Article 56 did not apply to other cooperatives until 1996. Colo. Sess. Law 1996, ch. 117, § 7–56–101 at 478. Hence, the cross-reference to article 55 in § 40–9.5–112 cannot be interpreted as a choice between article 55 and article 56.

Third, plaintiff asserts that § 40–9.5–116, which authorizes electric cooperatives to invest in state transportation projects, would not be necessary unless electric cooperatives otherwise could not make investments in nonelectric entities. However, § 40–9.5–116(2) provides that "the board of directors of a cooperative electric association may give preference to" investments in public transportation projects in certain circumstances. Hence, the statute shows the General Assembly's recognition that electric cooperatives could have other investments.

Fourth, plaintiff urges us to follow cases from other jurisdictions that have prohibited similar action by cooperative associations under their particular statutes. *See, e.g., Flint Elec. Membership Corp. v. Barrow,* 271 Ga. 636, 523 S.E.2d 10 (1999); *Mun. Elec. Auth. v. Ga. Pub. Serv. Comm'n,* 241 Ga.App. 237, 525 S.E.2d 399 (1999); *Tallahatchie Valley Elec. Power Ass'n v. Miss. Propane Gas Ass'n,* 812 So.2d 912 (Miss.2002); *Midlothian Butane Gas Co. v. Hilco Elec. Coop., Inc.,* 43 S.W.3d 677 (Tex.App.2001).

We decline to do so because the statutes at issue in those cases were much more limiting

than the Colorado statutes before us. Indeed, other jurisdictions have construed their statutes as allowing nonprofit electric cooperatives to own stock in for-profit subsidiaries. *See, e.g., DeKalb County LP Gas Co. v. Suburban Gas, Inc.,* 729 So.2d 270 (Ala. 1998); *Lewis v. Jackson Energy Coop. Corp.,* — S.W.3d ——, 2002 WL 31545858 (Ky.Ct. App. No.2001–CA–001103–MR, Nov. 15, 2002).

In sum, these cases provide little guidance because each case interprets its own particular statutory scheme, all of which differ to varying degrees from the Colorado statutes at issue here.

■ We need not address plaintiff's public policy arguments because we view the relevant Colorado statutes as unambiguous, and we therefore defer to the General Assembly's declaration of public policy. *See City & County of Denver v. Tihen,* 77 Colo. 212, 235 P. 777 (1925), *overruled in part on other grounds by State Farm Mut. Auto. Ins. Co. v. Temple,* 176 Colo. 537, 491 P.2d 1371 (1971).

Accordingly, we conclude LPEA's governing statutes do not limit it to providing only electric and related services.

### B.

We also reject plaintiff's contention that the governing statutes prohibit LPEA from acting in part as a for-profit corporation by forming or investing in a for-profit subsidiary. On appeal, plaintiff does not argue that LPEA has become a for-profit corporation or that the subsidiaries are its alter ego, and we express no opinion on those issues.

■ A cooperative association "shall not be carried on for profit." Section 7–55–101(1)(d). However, article 55 does not prohibit a cooperative association from owning a for-profit subsidiary.

■ A nonprofit corporation has the power to "purchase, receive, subscribe for, and otherwise acquire shares and other interests in, and obligations of, any other entity; and to own, hold, vote, use, sell, mortgage, lend, pledge, and otherwise dispose of, and deal in and with, the same." Section 7–123–102(1)(f). The statute also allows a nonprofit corporation to "invest and reinvest its funds." Section 7–123–102(1)(h). Likewise, nothing in article 123 prohibits a nonprofit corporation from forming or investing in a for-profit subsidiary.

Plaintiff has cited no Colorado case, nor have we found one, holding that either a nonprofit cooperative association or a nonprofit corporation is precluded from investing in for-profit subsidiaries. The question of whether such investments might be prohibited if the nonprofit corporation thereby became a de facto for-profit corporation is not before us.

Accordingly, we conclude the governing statutes do not prohibit LPEA from forming and investing in a for-profit subsidiary.

### II.

■ Plaintiff next argues that because of the manner in which the 1995 amendment to its articles of incorporation was adopted, LPEA should be estopped from relying on that amendment to justify formation of and investment in for-profit, nonelectric subsidiaries. We disagree.

■ Equitable estoppel is designed to achieve justice where four elements are present: (1) the party to be estopped by its conduct must know the facts; (2) that party must intend that the conduct be acted upon or must act so the party asserting estoppel is justified in believing the conduct was so intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) that party must detrimentally rely on the other party's conduct. *Dep't of Health v. Donahue,* 690 P.2d 243 (Colo.1984).

A cooperative electric association may amend its articles of incorporation if it complies with § 7–55–109, which provides as relevant here:

The articles of incorporation of a cooperative association or corporation may be amended at any regular or special meeting of the stockholders or members of such association. The proposed amendment must be first approved by a two-thirds majority of the directors. The notice of

such meeting shall set forth or have attached thereto the proposed amendment and shall be mailed to each member of record at least ten days prior to the meeting date.... The proposed amendment shall be approved by an affirmative vote of a majority of the stockholders or members present or voting by mail.

Here, both parties agree LPEA complied with § 7–55–109 by, among other things, sending a notice that contained the proposed amendment. Nevertheless, plaintiff argues LPEA's notice was insufficient and unfair because LPEA intended to "broaden the general purposes of the cooperative," but did not disclose this intention in its notice. We are not persuaded.

The statutory notice provision does not require a cooperative association to explain potential future applications of an amendment. No Colorado case has imposed this requirement.

Moreover, the plain language of the amendment gave LPEA the power to form subsidiary businesses and did not limit the potential subsidiaries to nonprofit corporations. Hence, a reasonable person considering the proposed amendment could not assume this limitation and assert detrimental reliance based on LPEA's nondisclosure of its alleged long-term plans. *See Comm. for Better Health Care for All Colo. Citizens v. Meyer*, 830 P.2d 884 (Colo.1992)(reliance of party seeking to invoke equitable estoppel must be reasonable).

Accordingly, we conclude LPEA is not estopped to rely on the amendment.

### III.

Plaintiff finally argues the governing statutes and LPEA's bylaws restrict its use of undistributed member capital to the provision of electric services and, thus, LPEA wrongfully invested member capital in the subsidiaries. We reject both contentions.

### A.

Under the governing statutes, patronage capital is "any capital credit, patronage dividend, or patronage refund allocated by a cooperative electric association ... to a member or patron thereof." Section 7–55–101.5.

Cooperative electric associations have the power to:

use patronage capital which has been declared by such association to be distributable or payable to a member or patron *for expenditures associated with the provision of electric service* ... as directed by the board of directors of the association after the association has given notice thereof.

Section 7–55–107(2) (emphasis supplied). No Colorado case has interpreted this language.

■ Plaintiff argues the emphasized phrase limits a cooperative electric association to using patronage capital only for electric services. We are not persuaded.

Section 7–55–101(1)(a) explains that earnings are distributed to each consumer or member in proportion to the services accepted by that consumer or member, among other things. *See also* James B. Dean & Donald A. Frederick, *Business Cooperatives: Characteristics, Opportunities and Legal Foundation*, 22 Colo. Law. 953 (May 1993)(in a cooperative association, benefits are distributed on the basis of use). The phrase "for expenditures associated with the provision of electric services," when applied to members' distributable capital, embodies this principle.

Furthermore, if distributable patronage capital could be used only as plaintiff argues, then the phrase "as directed by the board of directors" would not be necessary. We interpret statutes to give effect to all provisions. *Farmer's Reservoir & Irrigation Co. v. Consol. Mut. Water Co.*, 33 P.3d 799 (Colo. 2001).

Thus, in our view, this phrase describes allocation of patronage capital to members based on their consumption of electric services and does not limit the board of directors' use of patronage capital.

Accordingly, we conclude the applicable statutes do not limit LPEA to using patronage capital for electric services.

### B.

■ We also reject plaintiff's argument based on LPEA's bylaws.

The bylaws explain that members' and consumers' payments for electric service charges, in excess of the cost of service, called patronage, constitute the cooperative

association's capital. In determining costs of service, the bylaws refer to various credits that must be considered, including "interest on investments."

The bylaws allow the board to retire members' patronage capital if it determines "the financial condition will not be impaired thereby." However, the bylaws impose no restriction on the use of members' capital before its retirement. The bylaws expressly contemplate that LPEA will hold interest-bearing investments. Because LPEA issues no stock, the most likely source of investable capital would be members' patronage capital. Hence, we will not imply a limitation on the board's investment discretion. *Cf. Rifkin v. Steele Platt*, 824 P.2d 32 (Colo.App.1991).

> The articles of incorporation allow LPEA: To purchase, receive, lease as lessee, or in any manner acquire, own, hold, maintain, *use*, convey, sell, lease as lessor, exchange, mortgage, pledge, or otherwise dispose of any and all real and *personal property* or any interest therein necessary, useful or appropriate to enable the corporation *to accomplish any or all of its purposes.*

(Emphasis supplied.) Undistributed patronage capital would constitute "personal property" available to accomplish LPEA's "purposes." After the 1995 amendment, those purposes include formation of subsidiaries.

LPEA's capital structure, like that of most cooperative associations, allows the association to retain some or all of the operating profit as working capital, but requires the association to credit each member's capital account to reflect the ownership interest of the member in the retained capital. Dean & Frederick, *supra*. Thus, investing patronage capital is not inconsistent with crediting of each member's capital account to reflect that member's ownership interest.

Accordingly, we conclude LPEA did not violate its bylaws by investing patronage capital in the subsidiaries.

The judgment is affirmed.

Judge DAVIDSON and Judge ROY concur.