187 P.3d 1207 (2008)
COLORADO CITIZENS FOR ETHICS IN GOVERNMENT, Petitioner-Appellee and Cross-Appellant,
v.
COMMITTEE FOR the AMERICAN DREAM, Respondent-Appellant and Cross-Appellee, and
Division of Administrative Courts, Appellee.
No. 07CA1176.
Colorado Court of Appeals, Div. IV.
May 29, 2008.
*1212 Chantell Taylor, Denver, Colorado, for Petitioner-Appellee and Cross-Appellant.
Hackstaff Gessler, L.L.C., Scott E. Gessler, Mario D. Nicolais, II, Denver, Colorado, for Respondent-Appellant and Cross-Appellee.
John W. Suthers, Attorney General, Denver, Colorado, for Appellee.
Opinion by Judge WEBB.
In this action concerning the Campaign and Political Finance Amendment, Colorado Constitution article XXVIII, and the Fair Campaign Practices Act (FCPA), sections 1-45-101 to -118, C.R.S.2007, respondent, Committee for the American Dream (CAD), appeals the administrative law judge's (ALJ) judgment imposing a monetary penalty for violation of reporting requirements. Petitioner, Colorado Citizens for Ethics in Government (CCEG), cross-appeals the ALJ's order awarding attorney fees to CAD on a claim that CCEG voluntarily dismissed. We affirm.
CAD is a political committee registered with the Secretary of State. It supports candidates for political office who have a pro-business and pro-property rights agenda, opposes those who do not, and is funded solely by contributions from the Colorado Association of Home Builders (CAHB), a membership organization.
During the November 2006 election cycle, CAD contracted with Rock Chalk Media to produce television advertisements urging voters to oppose Representative John Kefalas, who was seeking reelection to the Colorado State House of Representatives. Rock Chalk arranged with Comcast Spotlight to broadcast these advertisements.
CAD filed reports under section 1-45-108, C.R.S.2007, with the Secretary of State for all contributions received and expenditures made in 2006, including the payments made to Rock Chalk. Its reports did not identify Representative Kefalas as the target of its advertisements, nor did it file either itemized reports of membership contributions from CAHB or a separate electioneering communications report.
CCEG filed a complaint with the Secretary of State alleging that CAD's failure to file itemized reports of membership contributions and a separate electioneering communications report that named Representative Kefalas violated Article XXVIII and the FCPA. When the hearing began, CCEG moved to dismiss its membership contributions claim, and the ALJ granted that motion.
In a thorough and well-reasoned decision, the ALJ found that the advertisements were electioneering communications within the meaning of Article XXVIII, section 2(7)(a); that "the regular course and scope of business" exception to the definition of electioneering communications under Article XXVIII, section 2(7)(b)(III) did not apply to CAD; that although CAD complied with all other contribution and expenditure reporting requirements, it failed to file separate electioneering communications reports; and that CAD did not identify Representative Kefalas by name in its reports as required by the Secretary of State's FCPA Rule 9.3, 8 Code Colo. Regs. 1505-6, for electioneering communications reports under Article XXVIII, section 6(1).
The ALJ imposed a $1000 penalty on CAD under Article XXVIII, section 10(2). He also awarded attorney fees of $2,722.44 to CAD, concluding that CCEG's membership contributions claim was groundless as filed.

I. Mootness
We first address and reject CCEG's assertion that newly enacted FCPA Rule 9.5.1 renders CAD's appeal moot.
*1213 Generally, appellate courts will not render opinions on the merits of an appeal when the issues presented have become moot because of subsequent events. United Air Lines, Inc. v. City & County of Denver, 973 P.2d 647, 652 (Colo.App.1998), aff'd, 992 P.2d 41 (Colo.2000). A case is moot when a judgment would have no practical effect on an existing controversy or would not end any uncertainty. Id.
After the ALJ's decision, the Secretary of State promulgated FCPA Rule 9.5.1, which provides that a political committee is not required to file electioneering communications reports separate from its regularly filed disclosure reports, so long as any expenditure for electioneering communications is disclosed and the disclosure includes the name of the candidate referred to in the electioneering communication.
Rule 9.5.1 makes unlikely another dispute about whether a candidate referred to in an electioneering communication must be identified in some type of disclosure report. Nevertheless, because Rule 9.5.1 has only prospective application, we must determine whether the $1000 penalty against CAD was erroneous.
Accordingly, we conclude the case is not moot.

II. Evidentiary Issue
We begin with CAD's contention that the ALJ abused his discretion by admitting documentary evidence without proper authentication under CRE 901(a), because if essential evidence was admitted improperly the penalty against CAD could not stand. We discern no evidentiary error.
The documents at issue are (1) a Record of Request for Purchase of Political Time; (2) an Agreement Form for Non-Candidate/Issue Advertisements; (3) an Affidavit of Performance; and (4) invoices from Rock Chalk.
"The requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." CRE 901(a).
Whether a proper foundation has been established is a matter within the sound discretion of the trial court, whose decision will not be disturbed absent a clear abuse of discretion. People v. Huehn, 53 P.3d 733, 737 (Colo.App.2002).
Administrative hearings need not comply with the strict rules of evidence. Id. The standard to be applied is whether the evidence has probative value commonly accepted by reasonable and prudent persons in the conduct of their affairs. Id.
Here, when asked about the Record of Request for Purchase of Political Time, CAD's registered agent, Rob Nanfelt, testified that he had authority to purchase political time and CAD had hired Rock Chalk to produce television advertisements. As to the Agreement Form for Non-Candidate/Issue Advertisements, he testified that CAD purchased airtime for advertisements that advocated against Representative Kefalas. He further testified that the invoices from Rock Chalk referred to these advertisements and that CAD paid for the advertisements to air between October 23 and November 5, 2006.
Based on this testimony, we discern no abuse of discretion in admitting these documents as having been sufficiently authenticated under CRE 901(b)(I). However, these documents do not indicate the time frame in which the advertisements were broadcast, specify the broadcast area, or refer to Representative Kefalas by name.
On appeal, CAD concedes that the Affidavit of Performance, a computer-generated report from the Comcast website, which identified dates, airtimes, and the district in which the advertisements were broadcast, was exempt from the hearsay rule as an adoptive admission under CRE 801(d)(2)(B). Nevertheless, CAD argues that this report was not authenticated because Nanfelt testified that he lacked personal knowledge of its accuracy, and therefore it was inadmissible.
We agree with the ALJ that Nanfelt would not have authorized payment of the invoices from Rock Chalk if he doubted that the advertisements had been aired during the 2006 election cycle and in the district where Representative Kefalas was running. Hence, *1214 we perceive no need to further authenticate the Affidavit of Performance, because Nanfelt's conduct manifested "belief in its truth." CRE 801(d)(2)(B). Under these circumstances, we conclude that the ALJ did not abuse his discretion by admitting this document.
Collectively, these documents support the ALJ's factual findings that during the period of October 25 to November 5, 2006, Rock Chalk, on behalf of CAD, arranged with Comcast to broadcast 568 television advertisements opposing Representative Kefalas to voters in his district.

III. Electioneering Communications
We next consider and reject CAD's contentions that the advertisements either were not electioneering communications because they constituted express advocacy or came within an exception to the definition of electioneering communications because they involved CAD's regular business of supporting and opposing candidates.

A. Express Advocacy
CAD asserts that Article XXVIII treats express advocacy and electioneering communications differently, with distinct reporting requirements, and because the advertisements were express advocacy, they are not electioneering communications. It relies primarily on a statement in the biennial Bluebook analysis of ballot proposals prepared by the legislature, which explains that the electioneering communications provisions were intended to address political advertisements that refer to a candidate "without specifically urging the election or defeat of the candidate." Colo. Legislative Council, Research Pub. No. 502-1, 2002 Ballot Information Booklet: Analysis of Statewide Ballot Issues (2002).
Bluebook explanations, however, are not binding. Tivolino Teller House, Inc. v. Fagan, 926 P.2d 1208, 1214 (Colo.1996); see also Davidson v. Sandstrom, 83 P.3d 648, 654 (Colo.2004)("when the language of an amendment is clear and unambiguous, the amendment must be enforced as written").
Section 2(7)(a) defines "electioneering communication" as "any communication broadcasted by television . . . that unambiguously refers to any candidate . . . and is broadcasted . . . sixty days before a general election . . . to an audience that includes members of the electorate for such public office."
This unambiguous reference to "any communication" does not distinguish between express advocacy and advocacy that is not express. The word "any" means "all." See, e.g., Kauntz v. HCA-Healthone, LLC, 174 P.3d 813, 817 (Colo.App.2007). Further, section 2(7)(a) is triggered when a communication is made within thirty days before a primary election or sixty days before a general election, without regard to the communication's purpose. Because this language is clear, the Bluebook is not determinative.
Accordingly, we conclude that the advertisements meet the definition of electioneering communications under section 2(7)(a), and we turn to the exception on which CAD relies.

B. Regular Business Exception
CAD asserts the ALJ erred in concluding that the regular course and scope of business exception to the definition of "electioneering communication" under section 2(7)(b)(III) did not apply to CAD.

1. Standard of Review
An administrative agency's decision will not be reversed unless the agency acted in an arbitrary and capricious manner, made a determination that is unsupported by the evidence and the record, erroneously interpreted the law, or exceeded its constitutional or statutory authority. Reiff v. Colo. Dep't of Health Care Policy & Fin., 148 P.3d 355, 357 (Colo.App.2006).
We defer to an agency's interpretation in construing constitutional provisions and statutes relevant to its activities, and rules the agency has promulgated, but its interpretation is not binding. Bd. of County Comm'rs v. Colo. Pub. Utils. Comm'n, 157 P.3d 1083, 1088 (Colo.2007); Reiff, 148 P.3d at 358.
*1215 Here, we reject CCEG's invitation to defer to the ALJ's interpretation of the regular business exception because the record shows that at least one other administrative law judge has reached a contrary conclusion. Cf. State Bd. of Med. Exam'rs v. McCroskey, 880 P.2d 1188, 1196 (Colo.1994)(varying interpretations of the generally accepted standard of medical practice by different ALJs "will result in decisions which are not uniform, even though the facts may be similar"). Instead, we review the interpretation de novo. Stevinson Imports, Inc. v. City & County of Denver, 143 P.3d 1099, 1101-02 (Colo.App.2006).
When construing a constitutional amendment, courts must ascertain and give effect to the intent of the electorate adopting the amendment. Rocky Mountain Animal Def. v. Colo. Div. of Wildlife, 100 P.3d 508, 513-14 (Colo.App.2004). If that intent is not clear from the language of the amendment, courts should construe the amendment in light of the objective sought to be achieved and the mischief sought to be avoided by the amendment. Id. at 514. Courts should consider the amendment as a whole and, when possible, adopt an interpretation of the language that harmonizes different constitutional provisions, rather than one that would create a conflict between such provisions. Id.
Courts should ascertain voter intent by giving words their ordinary and popular meaning, without engaging in narrow or overly technical construction of the language. Id. A court may discern that intent by considering materials such as the ballot title, the submission clause, and the Bluebook. Id.
Courts must favor a construction of a constitutional amendment that will render every word operative, rather than one that may make some words idle or nugatory. Id. Courts should avoid an unreasonable interpretation or one that produces an absurd result. Id.
Courts are also guided by general principles of statutory interpretation and aids in construction. Id.

2. Scope of Exception
Section 2(7)(b)(III) states that an electioneering communication does not include "[a]ny communication by persons made in the regular course and scope of their business."
"Business" is not defined in Article XXVIII or the FCPA. The parties have cited no Colorado case, nor have we found one, interpreting the regular business exception under Article XXVIII. The parties do not point to any contemporaneous indicia of voter intent concerning this exception.
Dictionaries define "business" as "[a] commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain" and "a usually commercial or mercantile activity engaged in as a means of livelihood." Black's Law Dictionary 211 (8th ed.2004); see also Webster's Third New International Dictionary 302 (2002).
The term "business" has been defined in various ways by courts. Lindner Packing & Provision Co. v. Indus. Comm'n, 99 Colo. 143, 148, 60 P.2d 924, 926 (1936); see also Nicholl v. E-470 Pub. Highway Auth., 896 P.2d 859, 874-75 (Colo.1995) (Erickson, J., concurring in part and dissenting in part) ("When construed in statutes . . . the meaning of `business' `has been held to depend upon the context, the facts of the particular case, the intention of the parties, or upon the purposes of the legislation.'" (quoting 12A C.J.S. Business § 464 (1980))).
Unlike CAD, we do not perceive that the ALJ's decision rests on a distinction between for-profit and nonprofit organizations. We interpret "business" based on Article XXVIII's purpose and in its particular context, without regard to whether an organization has a profit objective, while recognizing that an exception to a statutory mandate should be construed narrowly. See Colo. Common Cause v. Meyer, 758 P.2d 153, 161 (Colo.1988); Brodak v. Visconti, 165 P.3d 896, 898 (Colo.App.2007).
Colorado voters adopted Article XXVIII because (1) "large campaign contributions made to influence election outcomes allow . . . special interest groups to exercise a disproportionate level of influence over the *1216 political process"; (2) "in recent years the advent of significant spending on electioneering communications, as defined herein, has frustrated the purpose of existing campaign finance requirements"; (3) "independent research has demonstrated that the vast majority of televised electioneering communications goes beyond issue discussion to express electoral advocacy"; and (4) "the interests of the public are best served by . . . providing for full and timely disclosure of campaign contributions, independent expenditures, and funding of electioneering communications, and strong enforcement of campaign finance requirements." Colo. Const. art. XXVIII, § 1. The voters intended that Article XXVIII would regulate communication designed to "influence the outcome of Colorado elections." Harwood v. Senate Majority Fund, LLC, 141 P.3d 962, 966 (Colo.App.2006); Sanger v. Dennis, 148 P.3d 404, 407 (Colo.App.2006).
We have determined that CAD's advertisements fit squarely within the definition of electioneering communications. And, because the advertisements opposed Representative Kefalas's reelection, CAD's goal was to influence the outcome of the 2006 election.
Exempting persons such as CAD, who regularly make electioneering communications for the purpose of influencing elections, from reporting requirements would frustrate Article XXVIII's purpose of full disclosure. Cf. Buckley v. Valeo, 424 U.S. 1, 77-80, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (construing the phrase "for the purpose of . . . influencing" to permit regulation of expenditures for communications that "expressly advocate the election or defeat of a clearly identified candidate").
Instead, we interpret the regular business exception more narrowly, as limited to persons whose business is to broadcast, print, publicly display, directly mail, or hand deliver candidate-specific communications within the named candidate's district as a service, rather than to influence elections. See Harwood, 141 P.3d at 966 ("the United States Supreme Court has used an intent-based approach in determining whether statements constitute `electioneering communication' under the Federal Election Campaign Act") (citing McConnell v. Fed. Election Comm'n, 540 U.S. 93, 189-94, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003)).
This interpretation recognizes the interplay among the three subsections of the regular business exception. The electioneering communication definition in section 2(7)(a) includes communications of broadcasters and newspaper publishers, among others, that "unambiguously [refer] to any candidate." The exceptions in section 2(7)(b)(I) and (II) encompass most material from those sources, such as "news articles," "editorial endorsements," or "opinions." However, reading the definition and these exceptions together, but without regard to section 2(7)(b)(III), would leave broadcasters and publishers subject to the reporting requirements of Article XXVIII for advertisements that "unambiguously [refer] to any candidate."
As discussed above, the reporting requirement is directed at persons who seek to "influence election outcomes." Broadcasters and publishers do not seek to influence elections as their primary objective, except where they are "owned or controlled by a candidate or political party," which limits section 2(7)(b)(I) and (II). Hence, such reporting usually would not advance the purpose of Article XXVIII.
Interpreting section 2(7)(b)(III) as exempting most broadcasters and publishers because they air or publish political advertisements "in the regular course and scope of their business" avoids such purposeless reporting. This interpretation is also consistent with cases such as Lindner Packing, which emphasize the need for regularity in identifying a business. Thus, a political advertisement aired or published by a broadcaster or publisher who did not regularly engage in such activity as a service would, consistent with the purposes of Article XXVIII, trigger reporting obligations.
The same analysis could be applied to candidate-specific communications by persons whose regular business is erecting billboards, direct mailing, or hand delivery, all of which section 2(7)(a) includes, but under this interpretation section 2(7)(b)(III) would exempt.
*1217 We are not persuaded otherwise by CAD's reliance on section 2(8)(b)(III), wherein, according to CAD, the phrase "in the regular course and scope of their business" applies to political committees.
Section 2(8)(b)(III) exempts from the definition of "expenditure" in section 2(8)(a):
Spending by persons, other than political parties, political committees and small donor committees, in the regular course and scope of their business or payments by a membership organization for any communication solely to members and their families.
CAD's argument fails to recognize that section 2(8)(a) includes within "expenditure" any of the enumerated actions by a political committee. Section 2(8)(b)(III) only creates an exception from this definition for "[s]pending by persons . . . in the regular course and scope of their business." Within that exception, the clause "other than . . . political committees," on which CAD relies, carves out a distinct category of persons whose activities remain within the definition of expenditure. Cf. In re E.L.M.C., 100 P.3d 546, 554 (Colo.App.2004) (interpreting the phrase "by a person other than a parent"). Thus, the wording of section 2(8)(b)(III) shows that the phrase "in the regular course and scope of their business" does not apply to political committees. See, e.g., Holliday v. Bestop, Inc., 23 P.3d 700, 706 (Colo.2001)(placement of commas between a limiting phrase and a fourth category of conduct excluded the fourth category of conduct).
Accordingly, we conclude that CAD does not come within the regular business exception.

IV. Reporting Requirements
CAD next contends it satisfied the electioneering communications reporting requirements under Article XXVIII, section 6(1) and FCPA section 1-45-108 through its compliance with other contribution and expenditure reporting obligations and that requiring a separate electioneering communications report is redundant. CCEG responds that under FCPA Rule 9.3, "[t]he name of the candidate(s) unambiguously referred to in the electioneering communication shall be included in the electioneering report," which CAD failed to do. However, because this requirement does not appear in either Article XXVIII or the FCPA, CAD disputes the validity of Rule 9.3. Hence, we first address that issue.

A. Rulemaking Authority
CAD asserts that adoption of Rule 9.3 was an unlawful exercise of the Secretary of State's rulemaking authority because the candidate naming requirement does not appear in Article XXVIII or the FCPA. We disagree.
Administrative rules are presumed valid and will not be struck down on review unless the challenging party has demonstrated that the rule is invalid beyond a reasonable doubt. Ross v. Denver Dep't of Health & Hosps., 883 P.2d 516, 519 (Colo.App.1994).
The validity of a rule depends on whether it is reasonably related to a legitimate use of state authority, and the burden of establishing unreasonableness is on the party challenging the regulation. Peshel v. Motor Vehicle Div., 43 Colo.App. 58, 59, 602 P.2d 875, 876 (1979).
"[T]he General Assembly cannot delegate explicitly for every contingency. . . . [T]herefore, it is . . . well-established that agencies possess implied and incidental powers filling the interstices between express powers to effectuate their mandates." Hawes v. Colo. Div. of Ins., 65 P.3d 1008, 1016 (Colo.2003).
Here, the ALJ concluded that Rule 9.3 was "reasonably related to the Secretary's constitutional and statutory authority"; that it was "reasonably necessary to effectuate Article XXVIII and the FCPA's mandate to make electioneering communications transparent to the public"; and that without requiring disclosure of a candidate identified in an electioneering communication, the Secretary of State could not fulfill the requirements of former section 1-45-109(7)(b), ch. 339, sec. 4, 2001 Colo. Sess. Laws 2159 (repealed effective July 1, 2007).
*1218 Former section 1-45-109(7)(b) required the Secretary of State to make electioneering communications reports available on a website that would allow users to generate summary reports based on a search by candidate name. It also expressly authorized the Secretary of State to "promulgate rules necessary for the implementation of this subsection." Without disclosure of a candidate's name in electioneering communications reports, users could not narrow website searches by candidate name and produce reports specific to a particular candidate.
However, CAD points out that former section 1-45-109(7)(b) applied to reports "required to be filed with a county clerk and recorder." And under section 1-45-109(1), "persons expending one thousand dollars or more per calendar year on electioneering communications" are required to file only with the Secretary of State.
CAD's interpretation leads to the anomaly that reports from persons expending $1000 or more per calendar year on electioneering communications, potentially a subject of state-wide interest, would not be posted on the Secretary of State's websites. We reject this outcome based on section 1-45-109(5). See Fielder v. Academy Riding Stables, 49 P.3d 349, 350 (Colo.App.2002)(appellate court may adopt a different reason for statutory interpretation than was reached below).
Under section 1-45-109(5)(a), the Secretary of State must operate a website affording free, read-only access to "any persons who wish to review reports filed with the Secretary of State's office." Like former section 1-45-109(7)(b), under section 1-45-109(5)(c), this website, "shall enable a user to produce summary reports based on search criteria that shall include . . . [the] candidate." And section 1-45-109(5)(e) empowers the Secretary of State to "promulgate rules necessary for the implementation of this subsection (5)." Thus, Rule 9.3 also facilitates the website searches described in former section 1-45-109(7)(b).
CAD's reliance on Adams v. Colorado Department of Social Services, 824 P.2d 83 (Colo.App.1991), for the principle that administrative rules cannot add to an existing statute, is misplaced because the division introduced this principle with the caveat, "unless expressly or impliedly authorized by statute." Id. at 86; see also Sears v. Romer, 928 P.2d 745, 751 (Colo.App.1996) ("Conversely, a regulation which is expressly or impliedly authorized by the enabling statute will be given force and effect."). Here, section 1-45-109(5)(e) sets forth such authorization.
Moreover, several constitutional and other statutory provisions support the Secretary of State's rulemaking authority concerning electioneering communications reporting. Colo. Const. art. XXVIII, § 9(1)(b) ("The secretary of state shall . . . [p]romulgate such rules . . . as may be necessary to administer and enforce any provision of this article. . . ."); § 1-45-111.5(1), C.R.S.2007 ("The secretary of state shall promulgate such rules . . . as may be necessary to enforce and administer any provision of this article."); § 1-1-107(2)(a), C.R.S.2007 ("[T]he secretary of state shall have the following powers: . . . [t]o promulgate, publish, and distribute . . . such rules as the secretary of state finds necessary for the proper administration and enforcement of the election laws.").
Accordingly, we conclude that adoption of Rule 9.3 was within the Secretary of State's rulemaking authority. See Fabec v. Beck, 922 P.2d 330, 340 (Colo.1996) (rule clarifying the process for verifying the number of valid petition signatures did not exceed Secretary of State's rulemaking authority, provided by the legislature, to administer the initiative and referendum process).
Having so concluded, we reject CAD's assertion that it satisfied the electioneering communications reporting requirements through its other reports. CAD admits that it did not file a separate electioneering communications report identifying Representative Kefalas. Nor are we persuaded that filing a separate electioneering communications report is superfluous. Although much of the contents overlap, reports under section 1-45-108 do not require disclosure of the candidate referred to in electioneering communications, nor did CAD do so in its other reports.
*1219 Accordingly, we further conclude that the ALJ did not err in finding that CAD violated Rule 9.3.

B. Jurisdiction to Enforce Rule 9.3
CAD next asserts that even if Rule 9.3 is within the Secretary of State's rulemaking authority, the ALJ lacked jurisdiction to impose a penalty for violation of this rule. We disagree.
An agency's determination of its own jurisdiction is reviewed de novo. Hawes, 65 P.3d at 1015.
ALJs can exercise jurisdiction only if the power to do so is given by statute. Dee Enters. v. Indus. Claim Appeals Office, 89 P.3d 430, 437 (Colo.App.2003).
Section 9(2)(a) of Article XXVIII grants an ALJ authority to conduct hearings on alleged violations of the Article and the FCPA, and to impose penalties if a violation has occurred. Section 10(2)(a) authorizes the appropriate officer to
impose a penalty of fifty dollars per day for each day that a statement or other information required to be filed pursuant to section 5, section 6, or section 7 of [Article XXVIII] or sections 1-45-108, 1-45-109 or 1-45-110, C.R.S. . . . is not filed by the close of business on the day due.
Here, the ALJ recognized that CAD satisfied the disclosure requirements under section 6(1) and section 1-45-108, but held that because CAD failed to file reports compliant with Rule 9.3 it was subject to penalties under section 10(2)(a).
Section 10(2)(a) does not expressly authorize penalties for violations of rules promulgated by the Secretary of State. However, we have concluded that Rule 9.3 is necessary to implement the former section 1-45-109(5), and under section 10(2)(a) sanctions can be imposed for violations of section 1-45-109. Hence, concluding that penalties cannot be imposed for violations of Rule 9.3 would render Rule 9.3 unenforceable, a construction we must avoid. See People v. Rea, 7 P.3d 995, 1000 (Colo.App.1999) (defendant's proposed construction of a sales tax statute that would allow persons to willfully fail to pay sales taxes but escape criminal liability would "render [the provision] virtually unenforceable").
Accordingly, we conclude that the ALJ had jurisdiction to impose a penalty for violation of Rule 9.3, and did not err by imposing a $1000 penalty on CAD.

V. Attorney Fees
On cross-appeal, CCEG contends the ALJ erred in finding the membership contributions claim groundless and on that basis awarding CAD attorney fees incurred to defend this claim until CCEG dismissed it the morning of the hearing. We disagree.
The Secretary of State's records show that CAHB contributed more than $237,000 to CAD during the 2006 election cycle. The membership contributions claim alleged either that CAD was not CAHB's sponsored political committee, and thus its contribution violated the $500 limit on contributions under Article XXVIII, section 3(5), or alternatively, that CAD had violated FCPA Rule 4.15(c) by not reporting the names and addresses of CAHB members who had contributed more than $20 in dues during a reporting period.
In a detailed written decision, the ALJ found that when CCEG filed the complaint it "did not have any evidence supporting the allegation that CAD was not `sponsored' by CAHB, nor did it have any evidence that any member of CAHB contributed $20 or more"; that the membership contributions claim "was based solely upon CCEG's belief that its allegations might be true, coupled with the expectation that through pre-hearing discovery it might find evidence to support the allegations"; and that "in the absence of any pre-filing effort to confirm those allegations, the [membership contributions claim] for Relief was groundless," entitling CAD to reasonable attorney fees and costs incurred in defending the claim under section 1-45-111.5(2), C.R.S.2007.
Section 1-45-111.5(2) provides that where a party brings or defends an action or any part thereof that "lacked substantial justification," the other party "shall be entitled to the recovery of the party's reasonable attorney fees and costs." "[L]acked substantial *1220 justification" means "substantially frivolous, substantially groundless, or substantially vexatious." Id.
Although no reported appellate opinion has applied this language, the same wording appears in section 13-17-102(4), C.R.S.2007, which has been addressed in numerous decisions. See, e.g., Brown v. Silvern, 141 P.3d 871, 875 (Colo.App.2005)("[A] claim or defense is groundless if the proponent's allegations, while sufficient to survive a motion to dismiss for failure to state a claim, are not supported by any credible evidence at trial."); Engel v. Engel, 902 P.2d 442, 446 (Colo. App.1995)("[A] trial court may properly determine that an action was `brought or defended' in a substantially groundless manner even when it is dismissed on the morning of trial. . . ."); Bilawsky v. Faseehudin, 916 P.2d 586, 590 (Colo.App.1995)(same).
We review an attorney fees award for abuse of discretion. Haystack Ranch, LLC v. Fazzio, 997 P.2d 548, 556 (Colo.2000). The trial court abuses its discretion when its findings are so manifestly against the weight of the evidence as to compel a contrary result. Id. Thus, the award must be supported by the evidence. Wheeler v. T.L. Roofing, Inc., 74 P.3d 499, 505 (Colo.App.2003). But we review de novo the legal analysis employed by a trial court in reaching its decision on attorney fees. Bd. of County Comm'rs v. Kraft Bldg. Contractors, 122 P.3d 1019, 1022 (Colo.App.2005).

A. Section 13-17-102(5), C.R.S.2007
We first reject CCEG's argument that the ALJ misinterpreted section 1-45-111.5(2) by rejecting its defense based on voluntary dismissal of the membership contributions claim under section 13-17-102(5).
Statutory interpretation is subject to de novo review. See, e.g., Reg'l Transp. Dist. v. Aurora Pub. Schs., 45 P.3d 781, 782 (Colo.App.2001). We seek to ascertain legislative intent, starting with the plain language of the statute and giving the words their ordinary meaning. USA Tax Law Ctr., Inc. v. Office Warehouse Wholesale, LLC, 160 P.3d 428, 431 (Colo.App.2007). If that language is unambiguous, we look no further. Id.
Under section 13-17-102(5), attorney fees shall not be assessed if, "after filing suit, a voluntary dismissal is filed as to any claim or action within a reasonable time after the attorney or party filing the dismissal knew, or reasonably should have known, that he would not prevail on said claim or action."
We are not persuaded by CCEG's assertion that because the ALJ quoted section 13-17-102(4) and looked to cases applying that section, he was bound to apply the limited safe harbor created by section 13-17-102(5).
Section 1-45-111.5(2) contains the same operative language and definitions as section 13-17-102(4). But as the ALJ recognized, the FCPA does not incorporate section 13-17-102(5), and it "contains no exception for dismissal of a groundless claim prior to hearing." See People v. Jaramillo, 183 P.3d 665, 671 (Colo.App.2008) (courts must respect the legislature's choice of language, and cannot add words to or subtract them from a statute).
CCEG's reliance on Bontrager v. La Plata Electric Ass'n, 68 P.3d 555, 558 (Colo.App. 2003), in arguing that "[w]hen multiple statutes or multiple statutory provisions apply to the subject matter, the court examines all applicable provisions to ascertain legislative intent," is misplaced because the various statutes considered by the Bontrager division were not limited in their application.
In contrast, section 13-17-102 appears in Title 13, "Courts and Court Procedures," and applies to "any civil action commenced or appealed in any court of record." The list of "courts of record" in section 13-1-111(1), C.R.S.2007, does not include administrative courts. People v. Rodriguez, 112 P.3d 693 (Colo.2005), cited by CCEG, does not address whether administrative courts are courts of record. The statement that "[e]ssential to being a court of record was the ability to fine and imprison as well as the ability to hold a party in contempt," id. at 703, suggests otherwise because administrative courts do not have such powers.
Nor are we persuaded by CCEG's Notice of Supplemental Authority, directing our attention *1221 to 2008 Colo. Sess. Laws. Ch. 112 (Apr. 10, 2008), which amends section 1-45-111.5(2) by adding, "Notwithstanding any other provision of this subsection (2), no attorney fees may be awarded under this subsection (2) unless the . . . administrative law judge . . . has first considered the provisions of section 13-17-102(5) and (6), C.R.S."
As indicated, before this amendment section 1-45-111.5(2) did not address dismissal of a groundless claim prior to hearing. When the General Assembly amends a statute, an intent to change it is presumed, although that presumption can be overcome by evidence that the amendment was intended only to clarify an ambiguity. Martin v. Union Pac. R.R. Co., 186 P.3d 61, ___ (Colo. App. 2007). To distinguish between a change and a clarification, we look to (1) whether the provision was ambiguous before the amendment, (2) the plain language of the amendment, and (3) the legislative history of the amendment. Id.
First, we discern no ambiguity in the prior language, nor has any been argued to us. Second, the legislative history is silent concerning this aspect of the amendment. Third, the language does not suggest either a change or a clarification. Cf. Corsentino v. Cordova, 4 P.3d 1082, 1091 (Colo.2000) (phrase "shall continue to apply" indicates clarification of prior law).
Hence, we conclude that the amendment was intended to change the statute, which further supports our determination that the ALJ did not err in declining to consider dismissal as a defense to the attorney fees claim.
Therefore, we agree with the ALJ that section 13-17-102(5) was not a defense to an attorney fees claim under the applicable version of section 1-45-111.5(2).

B. Groundlessness
We also reject CCEG's argument that the ALJ abused his discretion in finding the membership contributions claim groundless. CCEG has not appealed the amount of attorney fees awarded.
With record support, the ALJ found that:
 "CCEG's attorney/director candidly admitted during her deposition that at the time she filed the complaint she had no evidence of `nonsponsorship.'"
 Information about the relationship between CAHB and CAD in the Secretary of State's records reviewed by the attorney/director, while probably not "sufficient, alone, to prove that CAD was sponsored by CAHB . . . [was] sufficient to put CCEG on notice that its claim on [sic] nonsponsorship was probably groundless."
 The attorney/director also "acknowledged in her deposition that at the time she filed the complaint she had no evidence that any member of CAHB contributed $20 or more other than `the lack of itemization in the Secretary of State report.'"
 The Contribution Detail reports on file with the Secretary of State, also reviewed by the attorney/director, "suggest the probability that CAHB was lawfully limiting its per member [contributions] to less than $20 per reporting period to avoid the itemization requirement" because throughout the 2006 election cycle, CAHB had in excess of 4,400 members; its two largest contributions to CAD during reporting periods within this cycle were $77,861.05 and $72,138.95; and "[a]ssuming a membership of only 4,400 members, the average contribution would have been approximately $17.70 and $16.40 per reporting period, respectively."
Defending only its allegation of a FCPA Rule 4.15(c) violation, CCEG argues that the ALJ abused his discretion by focusing solely on CCEG's lack of prefiling investigation, including the attorney/director's failure to "contact anyone at CAHB or any of CAHB's members." To the contrary, Engel and Bilawsky both support the ALJ's analysis and conclusion. In Bilawsky, 916 P.2d at 588-90, the division noted the failure to interview any potential witnesses before the complaint was filed and the lack of evidence that the defendants had thwarted prefiling investigation. Here, CCEG does not assert that CAD or *1222 CAHB prevented it from conducting additional prefiling investigation.
We are not persuaded by CCEG's assertion that the ALJ disregarded its efforts made after commencement of the action to reduce or dismiss claims it found to be invalid. CCEG emphasizes discovery propounded to CAD concerning CAHB membership and dues, CAD's allegedly dilatory response, and CCEG's eventual subpoena of the information that CAD had not produced in response to the discovery. When CAD responded to the subpoena on the morning of the hearing, CCEG dismissed the claim based on the membership and dues information produced.
The ALJ identified postfiling efforts as among those factors that "a trial court must consider in determining whether a litigant is entitled to an award of attorney fees," citing Remote Switch Systems, Inc. v. Delangis, 126 P.3d 269, 275 (Colo.App.2005). Although the ALJ made no findings on CCEG's postfiling efforts to obtain the membership and dues information, we discern no basis for reversal.
CCEG cites no case, nor have we found one, requiring a trial court to make a finding on every factor addressed by either of the parties. While the better practice may be to do so, a trial court need only "specify the reasons for its award." Sullivan v. Lutz, 827 P.2d 626, 627 (Colo.App.1992).
Further, CCEG's written opposition to a fees award filed with the ALJ discusses the discovery issue and includes an affidavit by its attorney/director. According to the ALJ's decision, "[i]f, as CCEG alleges, CAD was dilatory in responding to CCEG's discovery requests, this may be a factor to consider in determining the reasonableness of the fees requested." Thus, the record shows that the ALJ considered CCEG's argument about postfiling efforts.
Nor are we persuaded that the ALJ abused his discretion by rejecting CCEG's argument that between February 23, 2007, when the complaint was filed, and the March 13, 2007 hearing, CAD's failure to have mitigated its damages by voluntarily providing the CAHB membership and dues information to CCEG was a defense to the fees claim.
An assertion that the party claiming attorney fees should have mitigated may be considered in determining reasonableness of the amount of fees sought, but failure to mitigate is not a complete bar to the claim. Ruffing v. Lincicome, 737 P.2d 440, 442 (Colo.App.1987) (award may be limited based on finding that a party did not act reasonably to extricate itself from litigation by moving for summary judgment). As indicated, CCEG has not appealed the amount of fees awarded.
Accordingly, we conclude that the ALJ did not err in determining that the membership contributions claim was groundless and awarding attorney fees against CCEG.
The judgment and order are affirmed.
Judge CASEBOLT and Judge TERRY concur.