The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
February 22, 2018

## 2018COA26

## 17CA0178, Denver Police Protective Association v. City & County of Denver — Labor and Industry — Labor Relations — Collective Bargaining

In this collective bargaining case, the division holds that body-worn cameras are not "personal safety and health equipment" under the Charter of the City and County of Denver. The division therefore concludes that body-worn cameras are not a mandatory subject of collective bargaining. Accordingly, the division reverses the contrary judgment of the district court.

Court of Appeals No. 17CA0178
City and County of Denver District Court No. 15CV33862
Honorable Ross B.H. Buchanan, Judge

Denver Police Protective Association,

Plaintiff-Appellee,

v.

City and County of Denver, Colorado,

Defendant-Appellant.

JUDGMENT REVERSED

Division VII
Opinion by JUDGE BERGER
Bernard and Freyre, JJ., concur

Announced February 22, 2018

Olson Law Firm, LLC, Sean T. Olson, Denver, Colorado, for Plaintiff-Appellee

Kristin M. Bronson, City Attorney, Robert D. Nespor, Assistant City Attorney, Kristin George, Assistant City Attorney, Denver, Colorado, for Defendant-Appellant

¶ 1     In this collective bargaining dispute, the district court held that defendant, the City and County of Denver (Denver), was obligated to engage in collective bargaining with plaintiff, the Denver Police Protective Association (DPPA), over a Denver Police Department (DPD) policy requiring certain of its officers to wear and use body-worn cameras (BWCs). The district court concluded that BWCs constituted "personal safety and health equipment," and thus are a mandatory subject of collective bargaining.

¶ 2     As it did in the district court, Denver contends that BWCs are not "personal safety and health equipment" and therefore it had no obligation to engage in collective bargaining over the DPD's policies regarding BWCs. We agree with Denver, hold that BWCs are not "personal safety and health equipment," and reverse the district court's judgment.

## I.     Relevant Facts and Procedural History

¶ 3     Denver and DPPA are parties to a collective bargaining agreement. That agreement implements the Charter of the City and

1

County of Denver (Charter),[1] which sets forth Denver's obligations regarding collective bargaining with certain of its employees.

¶ 4     The Charter provides that "Police Officers shall have the right to bargain collectively with [Denver] and to be represented by an employee organization in such negotiations."  Charter § 9.8.3(A).  However, this right is not unlimited.

¶ 5     The Charter describes three categories of subjects of collective bargaining.  First, there are mandatory subjects of bargaining.  These include compensation, the number of hours in the workweek, and "[p]ersonal safety and health equipment."  Charter § 9.8.3(B)(i), (iii), (v).  The second category describes permissive subjects of bargaining.  Denver may, but is not required to, bargain over these subjects.  This category includes "[o]fficer safety and health matters except as provided in 9.8.3(B)(v) [personal safety and health equipment]."  Charter § 9.8.3(D)(vii).[2]

¶ 6     In 2015, the DPD promulgated, without bargaining or consultation with DPPA, a policy regarding the use of BWCs.  The

_____

[1] The Charter is located in title I, subtitle B of the Revised Municipal Code of the City and County of Denver.

[2] The third category addresses matters upon which bargaining is prohibited.  Neither party contends that BWCs fall within this third category.

policy requires "patrol officers and corporals assigned to all six police Districts, the Gang Unit and Traffic Operations" to wear and use BWCs. Immediately after the policy was announced, DPPA contended that the wearing and use of BWCs was a mandatory subject of bargaining, and it demanded that Denver bargain. Denver refused.

¶ 7 DPPA filed suit, alleging that Denver violated the collective bargaining agreement by implementing the BWC policy without first bargaining in good faith with DPPA. The parties filed cross-motions for summary judgment. DPPA argued the BWC policy fell under either "compensation," "the number of hours in the workweek," or "personal safety and health equipment," and thus was a mandatory subject of bargaining. Denver contended that while the wearing and use of BWCs might bear upon "officer safety and health matters," BWCs were not "personal safety and health equipment," and Denver had no obligation to bargain over the wearing and use of BWCs.

¶ 8 The district court granted summary judgment in favor of DPPA. It first concluded that BWCs did not fall under "compensation" or "the number of hours in the workweek,"

3

conclusions that are not challenged on appeal. The court then concluded that "BWCs are a unique piece of equipment with a significant safety dimension integral to their purpose, despite arguably being secondary to their evidence-gathering purposes, and therefore qualify as 'personal safety and health equipment' within the meaning of the Charter." Consistent with this conclusion, the district court ordered Denver to bargain over the implementation of the BWC policy.

## II. Body-Worn Cameras Are Not "Personal Safety and Health Equipment"

### A. Standard of Review

¶ 9 We review the grant or denial of summary judgment de novo. *Miller v. City & Cty. of Denver*, 2013 COA 78, ¶ 12. "When, as here, the parties do not raise factual disputes, issues of statutory interpretation are particularly appropriate for resolution on summary judgment." *Bontrager v. La Plata Elec. Ass'n*, 68 P.3d 555, 558 (Colo. App. 2003).

¶ 10 Because a municipal charter is the equivalent of a statute or other legislation, "[i]nterpretation of a municipal ordinance involves a question of law subject to de novo review." *MDC Holdings, Inc. v.*

4

*Town of Parker*, 223 P.3d 710, 717 (Colo. 2010). "We employ the rules of statutory construction to guide our interpretation of the Charter." *City & Cty. of Denver v. Denver Firefighters Local No. 858*, 2014 CO 15, ¶ 10.

¶ 11   We construe a charter according to its plain and ordinary meaning. *Cook v. City & Cty. of Denver*, 68 P.3d 586, 588 (Colo. App. 2003). "Where charter language appears reasonably certain, plain, and unambiguous, resort to other rules of statutory construction is unnecessary." *Miller*, ¶ 17.

¶ 12   "Just as we favor interpretations that give harmonious and sensible effect to all parts of a charter, we avoid interpretations that yield absurd or unreasonable results." *Denver Firefighters Local No. 858*, ¶ 10.

## B.   Analysis

¶ 13   We must determine whether BWCs are "personal safety and health equipment," as DPPA claims and the district court held, or instead, equipment that relates to "officer safety and health matters," as Denver contends. If they are the former, Denver is required to bargain over their use, but if they are the latter, Denver is legally within its rights to refuse to bargain.

5

¶ 14     Both categories use some of the same key words — "safety" and "health."  Thus, it is hardly a surprise that a dispute has arisen over the proper categorization of BWCs.  Our job is to define "personal safety and health equipment" as precisely as possible because the categorization is outcome determinative.

¶ 15     We begin with the recognition that we are considering a police department policy.  The essential functions of any police department include both public and officer safety.  To that extent, *every* piece of equipment utilized by police officers relates to safety in some manner.

¶ 16     But the Charter distinguishes between two closely related concepts, and we must give substance to each of these concepts.  *Denver Firefighters Local No. 858*, ¶ 10.  If "personal safety and health equipment" includes all equipment that has any tendency to affect the personal safety and health of an officer, that category would include officer-worn radios, badges, and virtually every other piece of equipment that police officers use to carry out their important duties.  (Depending on the definition of "personal" it might also include police cars and computers used by the officers.)

¶ 17     We cannot apply such a definition because it ignores the two separate categories established by the Charter and the significant differences between them in terms of collective bargaining obligations. "If possible, we read ordinances as a whole, giving consistent, harmonious, and sensible effect to all parts." *MDC Holdings*, 223 P.3d at 717. So, "personal safety and health equipment" must have some more limited meaning.

¶ 18     We therefore are left to ascribe meaning to "personal safety and health equipment" that makes logical sense, that preserves the distinction between "personal safety and health equipment" and equipment that relates to "officer safety and health matters," and that can be meaningfully applied, not only in this case but in later cases as well.

¶ 19     The district court recognized the same problem that confronts us when it observed that "BWCs are a unique piece of equipment with significant safety dimension[s] integral to their purpose." The district court's solution was to construe "personal safety and health equipment" to include only equipment for which the police department explicitly recognizes a safety purpose.

7

¶ 20    While this was a yeoman's effort to resolve the problem, in the end, this solution is unworkable.  If the inclusion or exclusion of an explicit safety reference were dispositive, the DPD could entirely avoid a "personal safety and health equipment" categorization by the simple, expedient deletion of any reference to safety, even when it is apparent that safety is a significant or primary motivation for the use of the equipment.  That is not a reasonable interpretation of the Charter.  *See Bd. of Cty. Comm'rs v. Park Cty. Sportsmen's Ranch, LLP*, 45 P.3d 693, 711 (Colo. 2002).  Moreover, every piece of equipment is "unique" to some extent, and we are unable to see how the application of the district court's definition would be predictable or workable in practice.

¶ 21    Given the lack of other reasonable alternatives, we conclude that the only other option is to restrict the definition of "personal safety and health equipment" to equipment whose *principal purpose* is the safety of officers.  To read the Charter otherwise would make the distinction between "personal safety and health equipment" and "officer safety and health matters" nearly impossible to discern in any particular case, as illustrated by the facts presented here.  *See People v. Dist. Court,* 713 P.2d 918, 921 (Colo. 1986) (noting that

when interpreting statutes, or charters, "the construction which results in harmony rather than inconsistency should be adopted").

¶ 22    This case therefore turns on whether the *principal purpose* of BWCs is officer safety.  The promulgated BWC policy recognizes under the subheading "Purpose" five uses of BWCs:

>    a.    To capture crimes in–progress, whether perpetrated against the officer or the community and to maintain this evidence for presentation in court.
>
>    b.    To document initial police response, the discovery of evidentiary items and the action of the police pursuant to an investigation including calls for service of self initiated police contacts.
>
>    c.    To mitigate potentially confrontational interactions with members of the public through the presence of the BWC.
>
>    d.    To prevent and resolve complaints made against officers during the course of their police duties.
>
>    e.    To serve in training and performance feedback, ensuring the professionalism of all Denver Police officers.

¶ 23    DPPA relies on subsection (c) to argue that the safety of police officers is an integral purpose of the BWC policy.  Denver, on the other hand, contends that the main purpose of BWCs is evidentiary

in nature, and that even if BWCs impact officer safety, the safety effect is secondary to the evidentiary purpose.

¶ 24 Only a strained reading of the BWC policy supports the conclusion that the *principal* purpose of BWCs is officer safety. This conclusion is solidified when we contrast BWCs to equipment that everyone agrees is "personal safety and health equipment."

¶ 25 Firearms and bullet-proof vests are clearly "personal safety and health equipment," and thus a mandatory subject of bargaining. The obvious principal purpose of firearms and vests is to protect officers in the line of duty. That is not to say that the equipment does not have other uses unrelated to officer safety, but the primary reason for this equipment is to enhance officer safety.

¶ 26 On the other hand, many types of equipment may impact officer safety and have a safety purpose, yet are not reasonably considered "personal safety and health equipment." For example, neither party contends that an officer's radio is "personal safety and health equipment," yet an officer's ability to quickly call for assistance is integral to that officer's safety. Nor, as best as we can tell, has DPPA ever contended that this type of equipment

constitutes "personal safety and health equipment" as used in the Charter.

¶ 27    BWCs may incidentally impact officer safety, but their principal purpose is something other than safety. A BWC could deflect a knife, bullet, or other object and potentially save an officer's life. Even more theoretical is the possibility that a BWC could decrease the likelihood that an officer will be assaulted by a citizen if the citizen is aware that he is being filmed.[3] But, unlike bullet-proof vests, whose principal purpose is to protect officers from bullets, the principal purpose of BWCs is not to increase the safety of the officer.

¶ 28    We therefore conclude that BWCs are not "personal safety and health equipment" under the Charter, and are not a mandatory subject of bargaining.[4] The district court erred in concluding otherwise.

_____

[3] As the record in this case demonstrates, the safety impact in that regard, if any, is unclear. The two studies relied on by DPPA contradicted one another in their respective conclusions about the safety effect of BWCs.

[4] Because of our disposition, we do not address Denver's contention that the district court erred when it refused to defer to Denver's interpretation of the Charter.

11

### III. Other Issues on Appeal

¶ 29 Given our disposition, it is unnecessary for us to address the other alleged errors.

### IV. Conclusion

¶ 30 The judgment is reversed.

JUDGE BERNARD and JUDGE FREYRE concur.